**In re NEW YORK, N. H. & H. R. CO.**

**No. 16562.**

District Court, D. Connecticut.

June 3, 1942.

See, also, 46 F.Supp. 236.

Frederick W. Tillinghast and Hinckley, Allen, Tillinghast & Wheeler, all of Providence, R. I., for Edward B. Aldrich, Abby A. Rockefeller, and Winthrop W. Aldrich, as trustees, and United Gas Improvement Co.

Fitzhugh McGrew and White & Case, all of New York City, for Bankers Trust Co., as trustee under the First and Refunding Mortgage.

W. P. Palmer and Root, Clark, Buckner & Ballantine, all of New York City, for Bank of New York & Trust Co., as successor trustee of New England R. Co. Consolidated Mortgage.

Harry Kirshbaum, of New York City, for Certain Bondholders of Providence Securities Co.

Bentley W. Warren and Warren, Garfield, Whiteside & Lamson, all of Boston, Mass., for Boston & Providence Railroad Corporation and its trustees.

John B. Marsh and Mitchell, Taylor, Capron & Marsh, all of New York City, for City Bank Farmers Trust Co., as trustee under Central New England Ry. Co. First Mortgage.

George W. Martin, of New York City, for Connecticut Ry. & Lighting Co.

Robert T. Bushnell, Atty. Gen., for Commonwealth of Massachusetts.

Robert P. Weil, of New York City, for Empire Trust Co.

Edwin S. S. Sunderland and Davis, Polk, Wardwell, Gardiner & Reed, all of New York City, for New Haven Ins. Group.

Hiram S. Gans, of New York City, for Group of Holders of First Mortgage Bonds of New York, Westchester & Boston Ry. Co.

Paul D. Miller and Mudge, Stern, Williams & Tucker, of New York City, for Group of Banks Holding Collateral Notes.

Edgar P. Baker and Milbank, Tweed & Hope, of New York City, for Group of Insurance Companies Holding Bonds of New York, Westchester & Boston Ry. Co.

Harold C. McCollom and Davies, Auerbach, Cornell & Hardy, all of New York City, for Irving Trust Co., as trustee of 6% Collateral Trust Indenture.

Arthur Garfield Hays, and Eugene Untermyer, both of New York City, and Satterthwaite & Foulk, of Wilmington, Del., for Independent Bondholders Committee.

Howard W. Brown and Peabody, Brown, Rowley & Storey, all of Boston, Mass., for Merchants Nat. Bank of Boston, and Independent Group of Boston & Providence Stockholders.

Fred N. Oliver, of New York City, for Mutual Savings Bank Group.

Warren, Garfield, Whiteside & Lamson, of Boston, Mass., for New England Investment & Security Co.—1927, and Springfield Ry. Companies—1926.

John L. Hall and Choate, Hall & Stewart, all of Boston, Mass., for New York, New Haven & Hartford R. Co.

William W. Meyer and Hermon J. Wells, both of New Haven, Conn., for Trustees of the Principal Debtor and of Old Colony.

Charles A. Coolidge and Ropes, Gray, Best, Coolidge & Rugg, all of Boston, Mass., for Old Colony R. Co.

Charles J. Winkler, Jr., Burnham, Bingham, Pillsbury, Dana & Gould, all of Boston, Mass., for Old Colony Trust Company, as trustee under the First Mortgage of Old Colony R. Co.

Arthur E. Whittemore, of Boston, Mass., for Old Colony Commuters & Shippers League.

Joseph Reinhardt and Greenbaum, Wolff & Ernst, all of New York City, for Protective Committee for Holders of Housatonic Bonds.

Henry S. Drinker, Jr. and Henry Wolf Bikle, both of Philadelphia, Pa., for Pennsylvania R. Co.

Robert G. Dodge and Palmer, Dodge, Barstow, Wilkins & Davis, all of Boston, Mass., for Protective Committee of the Shareholders of Old Colony R. Co.

T. F. Davies Haines, of New York City, for President and Directors of The Manhattan Co.

Robert G. Dodge and Oscar M. Shaw, both of Boston, Mass., Special Counsel for trustees of Old Colony R. Co.

Walter A. Edwards and Edwards & Angell, all of Providence, R. I., for Providence & Worcester R. Co.

Franklin E. Parker, Jr. and Parker & Duryee, all of New York City, for Protective Committee for Holders of New Haven Preferred Stock.

John C. Rice and Gaston, Snow, Hunt, Rice & Boyd, all of Boston, Mass., for Provident Institution for Savings in Town of Boston.

Beckwith & Van Slyck, of New York City, for Protective Committee for Boston & New York Air Line Bondholders.

Raymond S. Wilkins, of Boston, Mass., for Protective Committee of Preferred Shareholders of Boston Ralroad Holding Co.

Malcolm Donald and Herrick, Smith, Donald & Farley, all of Boston, Mass., for Protective Committee for Holders of Harlem River & Port Chester Bonds.

John M. MacGregor, of New York City, for Protective Committee for New Haven Common Stockholders.

Claude E. Hamilton, Jr., of Washington, D. C., for Public Works Administration.

William J. Kane, of Baltimore, Md., for Railroad Credit Corporation.

Russell L. Snodgrass, of Washington, D. C., for Reconstruction Finance Corporation.

Harold E. Staples, of Providence, R. I., for Rhode Island Hospital Nat. Bank.

Peabody, Arnold, Batchelder & Luther, of Boston, Mass., for State Street Trust Co.

Dwight B. MacCormack, of Boston, Mass., for Massachusetts Special Railroad Commission.

Charles S. Clark, of Duxbury, Mass., and Eugene J. Phillips, of Providence, R. I., for Treasurer, State of Connecticut, as trustee under Boston & New York Air Line First Mortgage.

W. A. W. Stewart, M'Cready Sykes, and Stewart & Shearer, all of New York City, for United States Trust Company of New York, as trustee under the Harlem River and Port Chester First Mortgage.

Frederick H. Wiggin and Wiggin & Dana, all of New Haven, Conn., for Bankers Trust Co., as trustee under the First and Refunding Mortgage.

Edward C. Bailly and Willkie, Owen, Otis & Bailly, all of New York City, for New York Trust Co. as trustee under Worcester & Connecticut Eastern Mortgage.

Robert E. Goodwin and Goodwin, Proctor & Hoar, all of Boston, Mass., for Bankers Trust Co., as trustee under First and Refunding Mortgage.

James Garfield, of Boston, Mass., special counsel for trustees of New Haven R. R.

HINCKS, District Judge.

Since the allowance of claims for fees and expenses in a reorganization and the amounts allowed may depend among other things upon the outcome of the proceedings and various phases thereof, after ordering the plan returned to the Interstate Commerce Commission for further consideration the situation appeared to me too fluid to permit of a just and final appraisal of all the factors involved in the pending applications. However, the subsequent course of the proceedings before the Commission convinces me that the ultimate shape of the reorganization is now sufficiently static to justify final rulings on the great majority of the pending allowances. And since further delay would doubtless constitute considerable additional hardship to those involved, I feel that I should now pass upon the petitions and authorize such payments as may now be justified.

Fifty-four separate interests are represented by the pending petitions. In many cases several petitions are pending relating to the same interest. Many of the petitions cover services rendered over a period of in excess of five years. A record of fact going into great detail has been made upon each petition. Only one who has studied this voluminous record can appreciate fully the difficulty of making an objective appraisal, which shall be just and accurate, of the value of all this mass of expert labor.

I noticed that in Re Irving-Austin Building Corp., 7 Cir., 100 F.2d 574, at page 579, the court said:

"The preferred procedure to be followed is: (a) The court should first ascertain the maximum amount which may be allowed for the administration of the estate or the reorganization of the debtor. Settlement of this question first is essential. For when it is settled the court can order the balance of the estate to be divided among the creditors immediately and the dispute between counsel will not delay distribution among creditors.

"The second step is to ascertain how much each counsel should receive. Here, the court must measure the value of the services and also ascertain their benefit to the estate."

This observation led me to consider whether I could not simplify and reduce my labors by first determining how much of the debtor estates might properly be used for the satisfaction of all pending petitions in the aggregate, and then devise some fair basis for the division of that aggregate sum betwixt the numerous petitioners. Reflection soon convinced me, however, of the impossibility of such an approach. Necessarily, the amount of labor required of each of the interested parties will vary not only with the particular difficulties which beset the reorganization of each estate, but also with the particular difficulties encountered by each interest in any particular estate. Numerous other variables will interpose. And so I have concluded that, since no proper base exists for fixing an over-all limit for the aggregate of allowances to all parties, such an approach would necessarily be a resort to arbitrary and capricious action which well might stultify the Congressional intent that responsible creditor participation in the processes of reorganization should be encouraged by the allowance of reasonable compensation to the parties and their representatives for services reasonably essential to a just reorganization.

The passage from the Irving-Austin case, quoted above, is not inconsistent with these

views. When read in its entirety and in its context it means only that in order to expedite a distribution to creditors the court may properly estimate the dimensions of a reserve which shall be ultimately sufficient for the satisfaction of proper allowances. This done, in a proper case a distribution to creditors may be made and then the court "must measure the value of the services and also ascertain their benefit to the estate." Surely there is no just intimation in that decision that the values thus measured should by some Procrustean process be fitted to some prior estimate of the maximum aggregate which "may" be allowed.

■ I have proceeded, perforce, to a study of the pending petitions and the record made thereon before the Interstate Commerce Commission, coupled with the detailed reports of the Commission as certified to the Court. A performance of this laborious task convinces me that the maxima set by the Commission both as compensation for services and as reimbursement for expense should be allowed upon the petitions for allowances brought by the following parties, their counsel and associated experts:

Choate, Hall & Stewart, counsel for the principal debtor; James H. Brewster, Jr., et al. (Insurance Group); Mutual Savings Bank Group; James Garfield, special counsel for New Haven Trustees in the matter of claims of Connecticut Railway and Lighting Company; Ropes, Gray, Best, Coolidge and Rugg, counsel for the Old Colony; John L. Hall, special counsel for the New Haven Trustees in the matter of Palmer et al. v. Bankers Trust Company; Messrs. Dodge and Shaw, special counsel for Old Colony Trustees in the matter of Palmer v. Bankers Trust Company; Robert G. Dodge, special counsel for Old Colony Trustees in the matter of the proof of the Old Colony common claim; James Garfield, special counsel for New Haven Trustees in the matter of the Old Colony claims; Messrs. Dodge and Shaw, special counsel for Old Colony Trustees in the matter of the administration accounts against Old Colony; Oscar M. Shaw, special counsel for Providence, Warren and Bristol Trustees in the matter of the administration accounts against the Providence, Warren and Bristol; Bank of New York (as established by the Commission's supplemental order of January 21, 1942); Swan, Keeney and Smith, as counsel for the Trustee under the Boston and New York Air Line Railroad Company mortgage; Ropes, Gray, Best, Coolidge and Rugg, counsel for the Trustee under the New York and New England mortgage; City Bank-Farmers Trust Company, as trustee under the Central New England mortgage; New York Trust Company as trustee under the Worcester and Connecticut Eastern mortgage; Harlem River, Portchester bondholders protective committee; Reeve Schley et al., Committee for collateral noteholders; Providence and Worcester Railroad Company; Reconstruction Finance Corporation; Boston Railroad Holding Company preferred shareholders protective committee; William Boardman, special counsel for Hartford and Connecticut Western Trustees; Miller, Owen, Otis and Bailly, counsel for Life Insurance Companies (as established by the Commission's supplemental order of January 21, 1942); Old Colony shareholders protective committee; Peabody, Arnold, Batchelder & Luther, counsel for State Street Trust Company; Messrs. Tillinghast and Andrews, counsel for E. B. Aldrich et al.; Housatonic Bondholders Protective Committee; Railroad Credit Corporation (as established by Commission's supplemental order of January 21, 1942); Pennsylvania Railroad Company; Milbank, Tweed and Hope, counsel for the Bondholders of New York, Westchester & Boston; Rhode Island Hospital Trust Company as Trustee under Providence Terminal mortgage; Boston and New York Air Line Protective Committee.

Each of the foregoing petitions is covered by a comprehensive report of the Commission, and it will serve no useful purpose for me here to reiterate or expand the several sections of that report relating to those petitions. Suffice it to say that the maxima set by the Commission if allowed by the Court without reduction restricts the compensation of the attorneys affected to an average rate equivalent to about $12 per hour for time spent by partners and about $4 per hour for their associates.

I suppose that in contemporary society a lawyer in private practice will not be thought to be a slacker if he works forty hours a week. This amounts to 2,000 working hours a year. But not all of a lawyer's working time is productive: A successful lawyer must necessarily devote a substantial part of his time to the task of running a complicated office and of

maintaining contacts which may be productive of new business. Indeed, the mass of detail embodied in each of the pending petitions gives vivid illustration of the elaborate bookkeeping facilities required in a modern law office. An allowance of an hour a day or 300 hours a year seems to be a conservative estimate of these requirements of overhead. Thus, even under these exacting standards a lawyer has at most something like 1700 productive hours a year. To be sure, it is a matter of common observation that many successful lawyers contribute a considerable part of their productive time to charity cases and to the support of a variety of philanthropic and civic enterprises. But no one will contend that such activities, however desirable they may be from the standpoint of the community, should be reflected in the compensation derived from services rendered to insolvent estates.

Assuming, then, that a lawyer has 1,700 productive hours a year, and assuming further that he can vibrate between the tasks entrusted to him by a variety of clients wholly without loss of available productive time, compensation at $12 per hour, if eventually collected from all his clients, will yield him a gross income of $16,400 for the year. But out of his gross receipts he has large office expenses to pay. I note and can readily accept evidence in this record that now in many offices between 40% and 50% of gross is required for expense. On this basis, a gross income of $16,000 would net something less than $10,-000. And such a result, of course, does not even reflect the effect upon the lawyer's net income of such factors as ill health, bad accounts, and loss of productive time through the inevitable delays incidental to trial work and the conflicting demands of clients. But, of course, this result is somewhat improved if the over-all compensation allowed includes compensation also for the time of associates and law clerks. For the salaries of associates constitute one of the substantial elements of office expense.

And so, after analysis of the petitions and taking into account all relevant factors I have had no difficulty in concluding that the maxima set by the Commission upon the petitions listed above, if allowed in full for each such case, will constitute compensation no greater than reasonable from the standpoint of the bankrupt estates affected.

This conclusion, however, I apprehend, does not discharge my full duty in the premises. For, as pointed out in my memorandum on Petition for Order 492, this day entered, 46 F.Supp. 236, when a plan shall be approved it will be necessary for me to certify that all allowances made are reasonable. If the maxima set by the Commission were such as not to permit of compensation reasonable from the standpoint of the petitioners, surely I should make my finding to that effect now and return the petitions to the Commission now lest an impasse should result at a later date when I shall be called on to make my certificate.

Turning, therefore, to consider the reasonableness of these maxima from the standpoint of the petitioners, it appears, at least superficially, that they are predicated upon a rate of compensation substantially more restricted than that generally allowed in cases of corporate (non-railroad) reorganizations at least in this circuit. Cf. In re Allied Owners, 2 Cir., 79 F.2d 187; In re Republic Gas Co., D.C., 14 F.Supp. 703; and In re United Cigar Stores, D. C., 21 F.Supp. 869. And it would, I think, be too drastic to hold that none of the services comprehended in these petitions was entitled to compensation at a rate somewhat higher than the averages mentioned above.

But neither the maxima, as they have been set, nor the underlying report of the Commission, indicate that in fact or in intent the services involved have been subjected to such a rigid and drastic valuation. On the contrary, the Commission has made no specific findings that the time alleged to have been spent has actually been spent; that all the time spent was reasonably required for necessary and compensable tasks in hand; or that all of the work done by senior partners was of a nature so difficult that a greater part of it could not have been entrusted to junior (and less expensive) partners and associates. Nor was it necessary for the Commission, any more than it is for the courts, to make detailed findings showing to just what degree it weighted the several relevant factors. It was sufficient to announce a general finding based upon the whole record.

My study of the record leaves me with no disposition to question the time alleged to have been spent by the petitioners. Nor do I underestimate the high degree of professional skill possessed by

many of the petitioners and amply demonstrated by their contributions to these proceedings. But the eminence of counsel is at most a minor factor for present purposes, I think. To be sure, a private litigant who for his personal assistance insists upon the hall-mark of a great legal name may properly be required to pay therefor even though a lessor legal light could have served as well. But compensation payable from an insolvent estate must be restricted to that adequate for services of the nature actually rendered.

■ Here the petitions show a mass of services requiring degrees of professional skill varying between extreme limits. The task of charting the general course of the proceedings, of locating and raising the fundamental issues and shaping the sound groundwork necessary for their factual development, required skill and professional specialized experience lying outside the usual field of the general practitioner and the judge. Likewise, I think, as to the task of raising the framework for a sound feasible plan. Certainly services of this general type have great value to the estate. But obviously the time spent in giving such service is but a small part of the whole.

■ At the other extreme are the services of routine nature which could well be performed by any accurate and sensible junior. And between these extremes lies the great mass of services rendered in this case, consisting principally of the preparation and conduct of contested hearings before the Commission and the Court. In this field especially judgment must play a large part in the process of evaluation. The time spent cannot alone serve as a criterion. Account must be taken of the importance and inherent difficulties of the time-consuming controversies and the results obtained. And when a single petition covers a wide range of activities, each requiring a different degree of professional skill, an accurate appraisal of the value of each task performed is possible only upon a showing of the dimensions of the several tasks. Without such a showing, the petitioners who after all carry the burden of proof cannot justly expect either the Commission or the Court to apply generally a rate of compensation appropriate only for services of especial difficulty. And a mere showing that much time was expended by a senior partner does not of itself demonstrate that the time-consuming task could not have been satisfactorily performed by some junior. Certainly I have been much impressed by the abilities of a number of the juniors whose work in court and on brief I have observed.

■■ Another frequently-occurring factor which precludes an allowance on the basis of any straight-line average rate of compensation for time expended is the presence of overlapping activity covered in a number of petitions. To be sure, not infrequently a number of separate creditor interests may find themselves ranged together on some one underlying issue of law. Each of course is entitled to be fully heard, if desired. But just because each may have participated to some extent in a given litigation, it does not follow that each is entitled to full compensation from the estate for his time. To rule otherwise would be to compel an insolvent estate to pay for a single service many times over. In such a situation it is always possible, I suppose, for parties finding themselves in a community of interest to apply to the court to designate one of their number to carry on the activity in question, if indeed the activity is one which cannot be handled by counsel for the court's trustees. When this is done, the law of the case can be established with a minimum of duplicated effort and the parties, including those acting in a representative or fiduciary capacity, will have judicial exoneration from independent effort. And any party not content to take the results obtained by competent counsel appointed by the court can justly be expected to provide the compensation for the independent activity of its counsel.

This latter factor applies to officers of corporate trustees as well as to counsel. When several such trustees find themselves in a common position as to a given issue, I see no reason for the estate to pay, say, half a dozen vice-presidents each representing a different trustee, each to make a parallel study essential to the formulation of a conclusion on a given issue. One thorough study conducted from the common standpoint of the group by a competent agency designated by the court, if paid for by the estate, will be equally available to all similarly affected, and reliance thereon by each will generally fully satisfy all the fiduciary duties of each. To hold that the usual mortgage indenture entitled bondholders to more, would be to overstress the personal, at the expense of the fiduciary, element of the mortgage.

Bearing in mind these many factors, and eliminating such unnecessary duplication as appears, I feel on the whole that the maxima set by the Commission for the petitioners enumerated above represent reasonable compensation and may be deemed to include compensation at a rate substantially above the over-all average rate for tasks of unusual difficulty at least to the extent warranted by the proofs. And particularly in view of the apparent acquiescence of these petitioners in the maxima set (only one or two of them has voiced dissatisfaction), I allow for each the maximum set by the Commission.

### Lessors of Rejected Leases.

 · It is apparent that all services rendered to lessors whose leases have been rejected in these proceedings had an objective which was wholly adverse to the New Haven estate. The effort was to prove as large a claim in damages as the facts would permit for the sole benefit of the claimants and those deriving from them. In each case the claimants proceeded individually without representation as a class. In one case only—that of the Connecticut Railway and Lighting Company—did the lessor repossess; but its activity in accomplishing a repossession was just as essentially adverse to the New Haven estate as its activity in prosecuting its claim for damages.

Necessarily such litigation was countered by a defense which was furnished by the New Haven trustees at the expense of the estate. But I find no precedent nor can I perceive the presence of any equity for subjecting the New Haven estate to the expense of the prosecution as well. To be sure, it may be said that the determination of the litigation resulting from the lease claims was essential to the achievement of reorganization; that in that sense the New Haven estate was indirectly benefitted. But the same observation may be made of every defendant who is subjected to litigation. Generally a defendant in litigation, whether successful or otherwise, is not required to pay the plaintiff's counsel fees. Nothing in Section 77, Bankr.Act, 11 U.S. C.A. § 205, entitles such claimants to counsel fees as a matter of right. And it seems to me more consonant with the American institutions and with general considerations of equity that counsel for these claimants should look to their clients for payment. In Re United Cigar Stores, D.C.,

21 F.Supp. 869, at page 879, it appears to have been understood that the compensation for such services rendered to lessors should be paid by the lessors rather than the estate. The same principle is, I think, inherent in the decisions in Reconstruction Finance Corp. v. Herring, 9 Cir., 110 F.2d 320; In re A. Herz, 7 Cir., 81 F.2d 511; Teasdale v. Sefton National Fibre Can Co., 8 Cir., 85 F.2d 379, 107 A.L.R. 531; and Straus v. Baker Co., 5 Cir., 87 F.2d 401, at page 408.

Although under this holding the New Haven estate should not be directly subjected to such expense at the hands of its lessors, counsel for lessors who stand as secondary debtors in this proceeding may, of course, be compensated from the respective estates of the secondary debtors. But all allowances from the estates here under administration to counsel for the Connecticut Railway & Lighting Company and Boston and Providence trustees and their counsel and experts must be wholly disallowed in this court leaving counsel for Connecticut Railway and Lighting Company to look to his client for compensation and the Boston & Providence trustees and their counsel to look to the court of appointment for a suitable allowance.

### Objecting Banks.

 These three banks, the Merchants National Bank of Boston, the Rhode Island Hospital National Bank, and the President and Directors of Manhattan Company, appear to me to stand in a position analogous, for present purposes, to that of lessors whose leases were rejected. Like such lessors, their claims are essentially adverse to the estate of the New Haven both to the extent that they have each sought money damages from the estate and to the extent that they have each sought to enforce a valuation of their collateral on a special basis favorable to them and not available to others holding the same class of collateral. The cases cited in my discussion above of the petitions by lease claimants are applicable in principle here.

I do not mean to imply that there has been anything improperly obstructive in the position of these banks. On the contrary, each has stood for what it conceived to be its legal rights and counsel has pressed its position with great ability. But by way of contrast with the group of banks represented by the Schley Committee, which approached a common problem

by the path of compromise and negotiation, these claimants have each proceeded individually to assert bases of valuation for their collateral not available to their respective items of collateral as a class. Even if they should prevail in their views on appeal, I should feel it only equitable that each, like any successful plaintiff, should compensate its own counsel.

Certainly this conclusion is not inconsistent with the treatment accorded other petitioners, whether bondholders or collateral note-holders, whose services redounded to the benefit of all those of the class holding the same security. And the conclusion applies, perhaps, with especial force to the Merchants National, which alone of all secured creditors sought with eventual success to exclude the New Haven estate from its property interest theretofore existing in the pledged collateral.

### Independent Bondholders Committee, Its Counsel, Secretary and Auditor.

The underlying record shows that this Committee had its genesis in May or June, 1937, in conversations between its Chairman and its Secretary. As a result of these conversations, the Secretary who, so far as records show, had theretofore been a stranger to these proceedings, immediately went to work upon the formulation of a plan and was so engaged for several weeks even before the Committee was formed. Eventually the Committee was constituted of three members having an indirect proprietary interest in the debtor's first and refunding bonds and numerous issues of debentures. On July 20, 1937, the Committee was allowed to intervene by the Commission on a petition showing that it then represented $1,387,000 in face value of first and refunding bonds and secured debentures, owned by banking institutions and a foundation, and $166,000 in unsecured debentures of '57 of which $126,000 were owned by financial institutions. Theretofore, ever since the institution of these proceedings in 1935, the entire issue of first and refunding bonds, of which $138,000,000 were outstanding in the hands of the public, had been fully and effectively represented by Bankers Trust Company, the mortgage trustee, and about $38,000,000 were owned by members of the Groups of Insurance Companies and Savings Banks, both of which have been actively represented throughout these proceedings.

The Committee forthwith engaged two firms of lawyers in New York and one firm in Wilmington to represent it, and continued the services of its Secretary and further engaged an auditor, stipulating as to each, however, that it would not be holden for their compensation.

In January, 1938, the Committee obtained from the Commission permission to solicit authorizations, confining its solicitation, however, to first and refunding bonds, 4% debentures due 1957, and Providence Securities Debentures due 1957. By the date of the hearing hereon, as a result of these soliciting activities, compensation for which is apparently included within the pending requests for allowances, the Committee representation of first and refunding bonds had increased to about $2,500,000 and its representation of debentures to $282,000.

It may fairly be inferred from the record that the chief effort of this committee and its counsel and employees was directed to the formulation and support of successive plans. But in this line of activity, it relied principally upon the data developed by the trustees which had been integrated into various plans by others. And the plans proposed by the Committee seem to have been but a series of variations woven into the proposals of others. To be sure, it opposed the recognition of any equity in the old stock but it contributed no outstanding contribution to the support of this thesis. And in its effort to obtain a better treatment for first and refunding bonds its contribution was not the addition to the record of factual material not advanced by others demonstrating that these bonds were entitled to some specific better treatment but rather argument directed to influence a more favorable conclusion upon a record the substance of which had been made by others.

In addition to the foregoing activities, the record shows that the Committee and counsel also indulged in activities which were not compensable from the estate. Thus a minute of the Committee shows a resolution to study the advisability of committee activity to secure higher railroad rates and to bring about lower wages; also to obtain the enactment of new legislation relating to the reorganization of railroads. The evidence also shows some activity by the Committee and counsel relating to abandonments in Massachusetts,

and the possible use of some new-style, light-weight operating equipment. It also shows time spent in conferences with Westchester bondholders.

In addition to these non-compensable activities, the record also contains considerable evidence of overlapping activities by counsel. The original need of representation by three separate law firms is not satisfactorily explained; nor the need for attendance by so many lawyers at most of the Commission's hearings. The contribution of one lawyer seems to have been confined to the study of various proposed plans and suggestions for the Committee's plan. Whether such suggestions were ever accepted or had substantial utility does not appear.

The burden of proof is on the petitioners. The testimony of time spent by them is frankly an estimate having little base on contemporaneous records. And as for the Committee, at least its claimed expense was largely a matter of estimate made long after the actual expenses were incurred. There are cases in which it has been deemed wise and fair to withhold all allowance for counsel to a committee entering the scene to represent interests already represented. In re Paramount Publix Corp., 2 Cir., 85 F.2d 588; and Zirn v. Paramount Pictures, 2 Cir., 85 F.2d 593. The contention that activity by this committee was necessary to accomplish a representation of the "public" interest without the conflict inherent in group representation is not sustained. The very petition for intervention shows that the original representation was also essentially "institutional" and subject to the inherent conflict between the interests of secured bonds and unsecured debentures.

■ On the whole, I think it unduly harsh to withhold all compensation and reimbursement. And yet on the record it is well-nigh impossible to separate the time spent on useful, compensable activity resulting in some benefit to the cause of reorganization from other activities not compensable. Likewise, as to a separation of expenses properly allowable. In such a situation, doubts must be resolved against the petitioners who carry the burden of proof.

Accordingly I make the following allowances: To the Committee (which seeks no compensation) as reimbursement for Committee expense, the sum of $1,422.64; to Mr. Kann for necessary expense and travel, the sum of $250; to Mr. Baxter, $73.20; to counsel jointly the sum of $7,000 for services and $1,200 for expenses incurred; to E. D. Gould, Secretary, $1,500 for services and $540 for expenses incurred; and to Edward Leff, its auditor, $2,000 for services and $302 for expenses incurred.

### Old Colony Trust Company and Its Counsel.

■ This petitioner is mortgage trustee of Old Colony bonds which were outstanding in the amount of $12,000,000. Its principal activity in behalf of the bonds which it represented consisted in prosecuting its Petition for Order 63. This involved a thorough preparation of the facts and presentation of two or three legal propositions of not unusual difficulty. In accomplishing this task counsel for the petitioner had the benefit of certain cooperation from counsel of the State Street Trust Company, the owner of a small block of underlying bonds whose participation was considered desirable to produce a record sufficient to support an appeal on the merits if that should prove desirable.

This litigation resulted adversely to the petitioner's contentions and after careful deliberation no appeal was taken. Considering all the relevant data, it appears to me that $4,000 would fairly compensate counsel for this well-intended but unsuccessful service.

The remaining compensable services rendered by counsel, I think may fairly be classified as of a routine nature. Furthermore, many services were rendered which, viewing the situation from an objective standpoint, constituted unnecessary overlapping. The time and thought spent by counsel in "listening in" in the litigation on the administration claims against the Old Colony, its activities with respect to the appointment of trustees, and time spent in considering rejection of leases and the defects of various plans, all were duplicated by the more active advocacy of others. Occasionally, before the court and the Commission, counsel "stated the position" of his client. But it is difficult to attribute any benefit either to the general estate or to the Old Colony bonds from such pronouncements. Further time appears to have been spent in legal research over questions, doubtless of considerable difficulty, which have never been raised in

these proceedings. Altogether, I must conclude that the estate should not be holden for compensation for a very substantial part of the time spent.

The same situation has resulted in an expense account considerably out of line with what was necessary from the standpoint of the estate. I am somewhat shocked to find an expenditure of $975 for the printing of the principal brief in support of the Petition for Order 63. To be sure, printed briefs may be a pleasant luxury for the Judge; and in items of litigation in which there is a multiplicity of parties their expense is often justified. But certainly such an expense in the incidental piece of litigation in which the petitioners were opposed only by the New Haven trustees before a Judge who has cooperated with every effort to keep expenses to a minimum and who is thoroughly resigned to the prevalence of typewritten briefs, involved unwarranted expense. And the accumulation of $1,200 for travel expenses, a substantial part of which arose only from the supposed necessity "of listening in" and to "state positions", was unnecessary from the standpoint of resulting benefit to the estate.

All things considered, I fix reasonable allowances as follows: To Old Colony Trust Company, Trustee, $3,000 for services; to Bingham, Dana and Gould, $6,000 for services; and to the Trust Company by way of reimbursement of expenses, whether incurred by itself or its counsel, the sum of $1,300.

### United States Trust Company and Its Counsel.

This company was mortgage trustee of the Harlem River issue. Its services, as also those of its counsel, seem to have been confined to negotiation. From time to time it urged that interest be paid, conferring with the Trustees on that subject matter and stating its contention in court. However, it made no contribution to the record of fact which controlled the payments of interest and there is no basis for the inference that the payments made resulted from its activity. It took the initiative in forming a protective committee for Harlem River bonds and thereafter participated, along with the Committee, in negotiations with other parties over the treatment to be accorded to Harlem River bonds in a plan.

There is nothing in the record to indicate how much time officers of the mortgage trustee spent on these duties. The record does suggest to me that there was some unnecessary overlapping of activity betwixt officers of the trustee and counsel. However, it is apparent that routine services were required of these petitioners over a considerable period of time.

I allow to the trustee for its services and disbursements, $3,000 and $833.97, respectively; to its New York counsel, $3,000; and to its New Haven counsel for services and disbursements, $300 and $7.95 respectively.

### Irving Trust Company.

This Company is the trustee under the collateral trust which secured $23,000,000 of Gold Bonds (the "secured sixes"). The underlying security for the secured sixes was $23,000,000 of First and Refunding Bonds. Since the institution of these proceedings, this trustee has been under a fiduciary duty to see to it that all interest paid on the underlying bonds should be applied as provided in the trust indenture. However, since the New Haven trustees were under a primary obligation to safeguard these payments, it may fairly be inferred that the responsibility on the indenture trustee in that particular was not onerous. And as representative of the secured sixes it was proper for Irving to intervene and file a proof of claim. In this latter connection a careful study of the situation created by the pledge of bonds to R. F. C. was required for the effect of the pledge upon its proof of claim. It was also Irving's responsibility, especially in view of the absence of any Protective Committee for the secured sixes to represent the issue for all purposes of a plan. These seem to have been the principal fiduciary duties performed by Irving for which it is entitled to compensation.

The more extensive responsibility for safeguarding the interests of First and Refunding Bonds fell (to the extent that the bonds were not represented by others) primarily on Bankers Trust Company, as trustee under the mortgage which secured the entire issue of which only a part was pledged to secure the secured sixes. And so, as long as Bankers was active and effective in taking all action necessary for the protection of the entire issue, certainly there was no need for Irving to take af-

firmative action to protect the interests of the pledged bonds. At most, its duty in this respect was limited to the task of assuring itself that the interest of the underlying bonds was receiving the continuing and effective attention of Bankers. If its inquiries as to any item disclosed that Bankers, as the fiduciary primarily responsible, was giving the matter thorough consideration and was taking appropriate steps to effectuate its considered conclusions, Irving was under no fiduciary duty to duplicate or parallel the researches and efforts of Bankers.

A reading of Irving's petition with its attached affidavits, supplemented by a study of the supporting testimony in the record, fails to convince me that all the time and effort spent by Irving's counsel was really required for the full discharge of Irving's duties in the premises as defined above. And I am unable to find proof that the effect of much of this study was beneficial to the secured sixes or otherwise beneficial to the estate.

Since the record contains no breakdown or grouping of the services rendered, it is difficult to ascertain the volume of labor which was required for the protection of the secured sixes and which thus constituted a necessary and direct contribution to the development of a proper plan. On the basis of the best analysis which I can make on the record as it is I allow to Irving for services and disbursements $3,500 and $1,461 respectively; to its New York counsel $9,000; and to its Connecticut counsel $500.

### The Preferred Stockholders Committee, its Counsel and Agents.

The Commission has set a maximum of $2,800 for the allowance to counsel for the Committee, and $543.35 for his expenses. These maxima I find reasonable taking into account such showing as has been made of the nature and extent of the services actually rendered and the results obtained.

The Committee by its petition asked that its expenses be allowed in the sum of $28,553.07. Of this amount $27,383.08 represents charges for services and disbursements of the National Conference of Investors and of Robert E. Smith, the Committee's Secretary and the Chairman of said National Conference of Investors. The Commission has set as the maximum

for the expenses of the Committee the difference between these two sums, viz., $1,169.99, and has limited the allowance of expenses incurred by the National Conference and Smith to $12,229.08. Since the expenses of the Committee were stated to include the sum of $543.35 allowed above to counsel for his expenses, I allow to the Committee the sum of $626.64 on account of its other expenses.

The National Conference of Investors was an organization engaged in the business of forming and servicing protective committees for companies in reorganization. A reading of the record underlying the pending petition can leave little doubt that the dominant motive underlying the formation of this Committee was the desire of the National Conference and Smith, its Chairman, to obtain a gainful retainer, rather than any spontaneous desire on the part of stockholders generally to be represented by such a Committee. The National Conference paid a salary to Smith as its Chairman, to Smith's son-in-law as an office manager and furnished occasional secretarial work to Smith's daughter.

The work of the Conference was confined, as Smith himself testified, to "all the secretarial, managerial solicitation and correspondence with authorizing and non-authorizing stockholders". And Smith, as Chairman of the organization, in the performance of this task spent substantial time and incurred substantial expense in travel for the purpose of personally soliciting authorizations of representation by the Committee. It will be noticed that none of this work affected in the slightest degree the course of reorganization or had any bearing whatever on any issue raised in these proceedings or involved in any plan of reorganization.

Mr. Smith further testified that for a period of time (which was not defined) he "acted as technical adviser to the Committee"; that thereafter he resigned as such adviser but that, since the Committee "did not subsequently find another technical adviser", he had "on occasions advised with Mr. Parker and members of the Committee upon what you might term the technical aspects of the reorganization." This vague evidence, however, is wholly insufficient to support any charge against the estate. There is utterly nothing in the record to show the nature of the technical advice given, that the advice thus given was

adopted by counsel and proved beneficial to the estate, or indeed that Mr. Smith had any qualifications as a technical adviser on technical subjects.

On these facts, it is apparent that of the activities under the aegis of the Committee the only useful contribution to the course of reorganization was that performed by its counsel. This contribution has been found to have a value to the estate not exceeding $2,800. And the question remains whether the estate may be charged with an expense, wholly unproductive from the standpoint of reorganization, many times the value found for the only constructive service which was rendered. This question clearly requires an answer in the negative.

With the contention that the Act contemplates proper representation of stockholders at the expense of the estate, I fully agree. Undoubtedly if a neucleus of stockholders desires to organize and does indeed accomplish an organization which makes a constructive contribution to the reorganization, its committee may fairly expect to be reimbursed by the estate for the necessary and reasonable cost of soliciting stockholders for authorizations and for the secretarial expense of receiving and suitably handling the authorizations thus obtained: perhaps also for the expense of circularizing stockholders with progress reports from time to time at reasonable intervals.

I find no basis, however, for the view that an intensive high-pressure solicitation conducted by personal interview at the expense of the estate was contemplated. The Act was designed to provide group representation for the small security-holder who desired representation; not for the protection of those who make it their business to sell a service to security-holders who theretofore had shown no desire therefor. I hold, therefore, that the cost of solicitation which may be charged against the estate must be limited to the modest cost of one or two mailings to stockholders.

Doubtless considerable time and expense was incurred in interviewing and corresponding with individual stockholders on the substantive features of reorganization. There is, however, nothing in the record to suggest that such correspondence constituted a contribution to the ultimate achievement of reorganization or tended to improve the treatment accorded to the class. In carrying on such correspondence with non-authorizing stockholders, the Committee was acting as a volunteer; and such correspondence with authorizing stockholders benefited no one but the individual stockholders in question who thus may fairly be left to pay their share of this service in so far as liable therefor.

The argument that without intensive personal solicitation the representation of the Committee would have been so restricted that the views of its counsel would have had less weight, is specious. The equity of a plan is determined not by a show of hands but rather upon the evidence and the conclusions based thereon. The extent of representation is of little consequence in comparison with useful contributions to the underlying record of fact and the skill of counsel in marshalling the facts in support of the conclusions which he advocates.

I recognize that class representation may require some unproductive expense for the accomplishment and maintenance of organization. Such expense may be charged against the estate only on the theory that it is a procedural prerequisite to an affirmative contribution to reorganization. But in my judgment to allow the charge against the estate for unproductive procedure to exceed the value of the affirmative contributions would demonstrate a loss of proper perspective. And so to Mr. Smith and the National Conference I allow only the sum of $2,800.

### Bankers Trust Company and Its Counsel.

Bankers is trustee under the First and Refunding mortgage. As such, the proper range of its activity in these proceedings has been exceeded only by that of the Insurance Group and Savings Bank Group. Although the record on its pending petition leaves in some uncertainty the precise extent of the necessary services rendered by its officers as distinguished from the services rendered through its counsel, I feel warranted in allowing it the maximum set by the Commission for its services and expenses, including the allowance of $5,300 to its expert.

### White and Case.

These petitioners are chief counsel for Bankers Trust Company, trustee under the First and Refunding Mortgage. They have been active throughout the proceedings in

this court. I will enumerate and give some discussion to the more important controversies in which, on one side or the other of the issues involved, they carried the laboring oar.

First, there was the controversy with R. F. C., over the so-called Grand Central advances. This may fairly be classified as one of the three or four most difficult controversies begotten of these proceedings; likewise one of the most important from the standpoint of the amount involved. These factors are, I think, suitably reflected in the action of the Commission which set as the maximum for counsel who conducted this litigation in behalf of R. F. C. the sum of $16,000 for that service, computed apparently on an average hourly rate substantially in excess of that generally applied to other petitions. In view of the outcome of that controversy, which was adverse to the position of Bankers, I agree that a somewhat more moderate basis of compensation might be applied to the services of losing counsel without undue hardship. But clearly they are entitled to a compensation for these services which shall reasonably reflect the difficulty of the task and the high quality of the workmanship which characterized their effort. And there can be no doubt in view of the implications of the Supreme Court case of Benedict v. Ratner, 268 U.S. 353, 45 S.Ct. 566, 69 L.Ed. 991, that the controversy was one which it was proper for the mortgage trustee to bring into issue, notwithstanding my final conclusion that the so-called advances were valid under the applicable law. Indeed, neither here nor elsewhere amongst the activities of these petitioners and of their associates and their client-trustee was there anything which gave me cause to feel that eagerness to earn a fee had resulted in activity not reasonably justified under the exigencies of the ever-changing situation.

Petition for Order No. 217, prepared and filed by these petitioners, gave rise to what was perhaps the most important controversy in the whole proceedings. On the basis of a formula developed informally by the trustees' staff in consultation with unofficial experts, it had developed that operation under the Boston & Providence lease had become unduly burdensome. Boston & Providence interests were opposed to a rejection of the lease, as also Old Colony interests who still viewed the B. P. lease as a valuable asset. The question was one of peculiar difficulty for the trustees of the court because of the conflicting contentions emanating from Old Colony and New Haven quarters. This impasse was allowed to continue for some time until counsel for Bankers forced the issue by filing Petition for Order 217.

As a result of the proceedings which then ensued, the propriety of the segregation formula was submitted to the Commission and after approval by the Commission and the Court became not only the basis for the rejection of Boston and Providence lease but also the very foundation of the structure of every plan which has since had any official sanction and the principal basis for the settlement of the administration accounts under the several rejected leases. The Old Colony account was thereafter promptly settled and if I had fully perceived the force of the objections made by these petitioners to the reservation which I inserted in Order 217, possibly the Boston and Providence accounts would have been substantially settled at the same time and a vast amount of future litigation on that item avoided.

 These petitioners effectively carried in this court the chief burden of the proceedings under Petition for Order 217. And the task in this court was one requiring services highly skilled and a penetrating knowledge of the complicated background of the then-existing situation. Their services in this connection are entitled to full compensation. But in fixing the compensation, the extent of the services must of course be defined. I have the impression that the task of justifying the formula before the Commission was carried principally by other counsel. And although these petitioners were also active, in association with counsel for the trustees, in the litigation over the Old Colony administration accounts which were settled contemporaneously with Order 217—not to mention other matters—the record does not show that their assistance in the settlement of the accounts resulted in any material contribution to the result attained. In the litigation over the administration accounts, counsel for the New Haven trustees were definitely carrying the primary responsibility and I must hold that all assistance furnished them by others is not compensable out of the estate in the absence of proofs which satisfy me that some benefit thereby resulted.

Other intense and voluminous activity of these petitioners centered around the case of Palmer v. Bankers Trust Company, which is in litigation in a Massachusetts court and still undecided. This is another of the most important and difficult controversies arising out of these proceedings involving the effect of the inclusion of the Old Colony lease within the pledge and mortgage of railroad assets by the New Haven to Bankers Trust Company, as trustee under the First and Refunding Mortgage. The claim is made in behalf of Old Colony interests that Bankers Trust Company, in its individual capacity as well as trustee, through its acceptance of the pledge, became liable for the breach of the lease under the doctrine of privity of estate.

In one aspect, by reason of the indemnity provisions in the mortgage the controversy may be viewed as a contest between Old Colony and New Haven bondholders. And doubtless the compensability of the services rendered, viewed from this aspect, is subject to the usual tests applicable in reorganization cases such as this. But there is another aspect to this litigation—viz., the attempt to enforce a personal liability against the mortgage trustee. In this respect this litigation is unique: not elsewhere in these proceedings has a personal liability been asserted against any fiduciary or other creditor participating in these proceedings on account of its undertaking given in the usual course of business long prior to the bankruptcy, to assume, in person or as trustee, the status of a creditor to any of the debtors now engulfed in these proceedings.

It is true, as far as I know, that no one has yet directly questioned the right of Bankers to eventual indemnity under its covenant of indemnity in the mortgage. But when monies of Bankers in substantial amount wholly without any New Haven earmark and needed for its private corporate purposes were sequestered in this proceeding in Massachusetts, doubtless it was of limited comfort to Bankers to reflect that even if eventually held liable under the lease it might still make application to this court for the indemnity provided under its mortgage. And perhaps its reflections in this predicament would have been even more disturbed if it had then known, as has since transpired, that responsible counsel later in these proceedings would contend that the express lien of its mortgage purporting to cover its services and expenses, etc., had been nullified by the provisions of Sec. 77. If such could conceivably be the fate of its supposed lien for services, could Bankers have complete confidence that the provisions of the mortgage which in no clearer language purported to give it indemnity against affirmative liabilities would not also disappear in the uncertain realms of bankruptcy, leaving it to "hold the bag"?

In such a predicament Bankers is entitled, I hold, to an indemnity for legal expenses measured not alone by the needs of the underlying bonds for representation or by its contribution to the course of reorganization. It has also a contract right to indemnity for legal expenses reasonably incurred for its own protection. And the reasonableness of its self-protective activities under fundamental principles must be gauged not alone from the actual results of its successive activities appraised with the aid of such hindsight as is now available, but also by the broader test of whether at the time when action was required it acted as any prudent and experienced man of affairs would have acted in a similar predicament.

When one comes to apply the test, the first question is whether Bankers was justified in all its effort (comprising two contested hearings in this court, one of which was appealed) to induce this court to take jurisdiction of the controversy to the exclusion of plenary action elsewhere. I felt at the time that the advantage of submitting an intricate question of Massachusetts real estate law to the Massachusetts courts outweighed the advantage of the more expeditious process of the bankruptcy court. However, at the time I had supposed that the case could be decided by a Massachusetts court without undue delay, probably on a demurrer. If I had foreseen that my consent to a plenary action and my consequent loss of control over the conduct of the case would have resulted in the long delay which has in fact ensued, I think my action would have been otherwise. The course which Bankers opposed has thus made it necessary to reflect the effect of this highly important element in the plan by a process of estimate necessarily vague, and it leaves Bankers' liability to be established in one court, and its right to indemnity—if liability is found—to be later determined in the bankruptcy court. The course which Bankers advocated would

have brought on all issues of liability and indemnity practically at the same time before this court, and although a decree of the bankruptcy court on the issue of liability would have lacked the authority of a decision by the State court, at least a final and binding decision on the issues from a federal Appellate Court could have been obtained, ere now in my judgment.

And so on this phase of activity, there can be no doubt that a proper regard for its own protection and regard for expeditious progress toward a plan which should be based not on vague estimate but rather on a considered adjudication, alike warranted Bankers in its persistent opposition to a plenary action. I think all its opposition to the Massachusetts forum was reasonable and fully compensable.

When the Massachusetts action was brought, Bankers through counsel made some preliminary moves looking toward a jurisdictional defense and to a removal of the case to the federal court in Massachusetts. This endeavor was later abandoned—on sound grounds, I think—but the question arises whether counsel are entitled to compensation for activity thus unproductive through abandonment. Perhaps compensation for such activity if not covered by some contractual right would be withheld in the discretion of the court. But here the contractual right of Bankers covered reasonable activity in its defense. Any prudent business man, situated as Bankers then was, subject to a claim for many millions, would have given careful study to all possible avenues of escape. Pleas to the jurisdiction and petitions to remove must be made if at all within drastic time limitations. On the whole, I think it reasonable that such defenses should be prepared concurrently with the study of the merits even though, as proved to be the case, research on the fundamental issue finally engendered sufficient confidence in the defense (in Bankers' view) to support a prompt submission, on demurrer, to the State court.

When we come to the research invested in the preparation for a submission on the merits, the volume of labor expended is indeed shown to be large. But the record amply supports a conclusion that the research proved to be substantially productive. However that may be, it is apparent that a defense to an action of such magnitude as this, justified research in every direction which reasonably could be expected to be productive, even though the results could not be appraised until the research was completed.

And here it seems to me no more than reasonable, in view of the feudal flavor of the doctrine underlying the Old Colony case and the generally recognized influence of English law upon the common law of Massachusetts, that the research should trace back the English law to feudal times. This indeed was a task requiring of counsel not only diligence but also an unusual degree of skill. Indeed, few private libraries contain the material for such research.

I have noticed an implication in the cross-examination of these petitioners that if demand had been sooner made upon the New Haven estate to take over the defense, perhaps much unnecessary labor might have been avoided. This implication I hold specious on two grounds.

First, although the strategy of New Haven counsel who took over the defense has apparently succeeded in delaying—perhaps forever—a decision on the merits leaving the controversy to be washed out by a sort of compromise inherent in a plan, even if the case never goes to issue in court (a contingency still far short of assurance) it does not follow that the careful preparation of a defense will have been without powerful influence on the terms of reorganization. This is evidenced by the fact that counsel generally seemed content in connection with their discussion before me of the last reported plan to deal with the Old Colony claim on this item as having a supposed compromise value of something like $4,000,000 instead of on the basis of a face value larger by several millions even after adjusted for certain duplications. In my observation, the sober research on the underlying law, rather than unsupported assertion, may be largely credited for this attitude. And it must not be forgotten that the results of this research have been consolidated so as to be presently available if the case shall hereafter come on for trial.

Second, Bankers had a contractual right of indemnity for "the costs and expenses of defending against any claim of liability in the premises." Mortgage, Art. 11, Sec. 2. It could elect to furnish its own defense and after a decision—favorable or otherwise—proceed against the New Haven estate for the reimbursement of its expense as well as indemnification for its liability if establish-

ed. Having this option itself to defend at New Haven expense, its bare delay in vouching in the New Haven to defend until some expense had accrued does not exonerate the New Haven estate. Exoneration would at least depend upon a showing that the expense had been incurred unreasonably. And such a showing is wholly absent in this record. For Bankers had no legal right itself to compromise the Old Colony claim and then hold the New Haven estate for what was paid by way of compromise. Nor could it foresee that the New Haven estate when vouched in to defend would so seek to deal with the claim. Indeed, such a course has never had judicial approval. And if the claim shall be wiped out by some compromise in a plan it will be only because, for lack of an adjudication on the claim, there is no other way to deal with it in a plan. And the long delay in obtaining an adjudication certainly is not attributable to Bankers. A court of equity in its zeal to protect an indemnitor from unreasonable demands will not, I apprehend, in so doing deprive the indemnitee of the substance of the protection for which it has contracted.

I notice some testimony in the record which might be construed to indicate the existence of some overlapping activity by these petitioners, as chief counsel for Bankers and Boston counsel who were retained for purposes of this case. But, of course, the retainer of Massachusetts counsel was a necessary result of my permission to Old Colony counsel to bring suit in Massachusetts—a course which Bankers vigorously opposed. And in my view the importance of this case, to the estate as well as to Bankers, and the technical difficulties of the subject matter, took it well outside the category of ordinary litigations so that some substantial expense was warranted to enable chief counsel for Bankers in New York to keep in close touch with the work of Boston associates and even within reasonable limits to carry on some independent research on the subject matter.

In addition to the chief activities of these petitioners discussed above, other service was rendered in connection with a multitude of other matters falling within a field which, like that of the First and Refunding Mortgage, is almost as broad as the system itself. After its interventions had been accomplished, a blanket proof of claim was carefully prepared and filed. Legal matters pertaining to the New Eng-land Steamship Company, Hartford and New York Transportation Company and numerous sales of property falling within the mortgage arose which required attention of counsel from time to time at frequent intervals. Many of these matters were not contested, yet a conscientious discharge of fiduciary duties often required that the expediency of action proposed by the trustees, which directly affected First and Refunding interests, should at least be verified by counsel. In my view all of this activity was useful and compensable. Also the activity opposing payment of dividends on the preferred stock of the Boston Railroad Holding Company. Much work was done which could fairly be classified as routine in the sense that it had a recurrent nature. But routine work, if thus broadly defined, requires varying degrees of skill; and much of that here involved required a meticulous regard for detail and skillful workmanship.

I give no discussion to the activities of the petitioners directly bearing on Bankers' position as to the substance of plans as proposed at successive stages because the court is in no more advantageous position than the Commission for the observation or appraisal of such activities. Services within this field are peculiarly difficult of appraisal and especially so when the record, as here, fails to show how much of the total time spent was devoted to this phase of activity.

On this account I venture to express the hope that before I am again called on to act on this petition (and any others which cover services primarily directed to a number of fairly distinct objectives), somewhere in the record (preferably in a writing appended to the petition) there may be a break-down of the services showing as nearly as possible the volume occasioned by each separate litigation or general line of activity. To be sure, thus to supplement the pending petitions would involve some additional labor on the part of counsel. However, in handling the bookkeeping entries for services hereafter rendered, if counsel would adopt the practice of using separate ledger sheets for each logical subdivision of their task, it would be a simple matter to note the appropriate ledger reference on each entry in their diaries and practically without additional labor a break-down would be developed which would vastly assist the Judge—and the Commission too, I should suppose. Of

course, the break-down to fully serve its purpose should carry through the distinction made in the pending petitions between the time expended by partners and that expended by associates.

On the whole, I feel that the record on this petition demonstrates that the compensable services rendered were reasonably worth more than the maximum set by the Commission. On that account I feel justified in asking the Commission to give the matter reconsideration. And since this may result in an improved record which will permit of more accurate appraisal, I think I may properly be excused from any more specific expressions at this stage.

### Wiggin and Dana.

These petitioners have served throughout the proceedings as associate counsel for Bankers Trust Company.

The principal contested litigations in this court which they conducted were as follows: The Annett claim; the Park Square controversy; the Air Line controversy over Cedar Hill real estate; and the controversy over the priority of lien on the Holyoke & Westfield. There can be no doubt, I think, that the activity of the petitioners in connection with all these litigated items was compensable. Each involved close points of fact or of law of sufficient importance to justify the litigation and had Bankers through its inactivity allowed the result to attach without considered judicial sanction, it might justly have been subject to criticism for the neglect of its fiduciary duties. And indeed, the litigation in each case was reasonably necessary to permit the accurate computation of the relative treatment of First and Refunding and other secured issues and secured creditors under a fair plan.

Each one of these items was the equivalent of a separate law-suit, each with its pleadings, proofs and arguments, oral and written. Although the amounts involved were not large in comparison with some of the issues in a railroad reorganization, nevertheless each directly involved a substantial sum, and the Annett claim, at least, was predicated upon contentions which if sustained might have had a wider application in these proceedings and served substantially to dilute the security of bondholders. To be sure, it could scarcely be said that of all the litigation in these proceedings these four cases were the most difficult and complicated. Nevertheless, each

of these cases did involve novel and difficult questions both of law and of fact and each viewed in contrast with the run of cases passing through trial courts of general and unlimited jurisdiction involved problems of unusual difficulty. In one of these controversies at least—the Air Line case—the record of fact was largely stipulated, and the stipulation was doubtless effective to reduce the labor of the court. But having watched the controversy throughout the course of its development, I have little doubt that the numerous negotiations which resulted in the stipulation required more time (and persistent patience) on the part of counsel than would have been required by a submission on evidence without stipulation.

Counsel who opposed in the Air Line case, I have allowed, at the maximum set by the Commission, the sum of $9,000 for services in that controversy. Opposing counsel in the Holyoke and Westfield controversy have likewise been allowed $3,500 for their services. And counsel for R. F. C. who opposed in the Park Square controversy, I have allowed, also at the maximum set by the Commission, about $10,000. This latter allowance, to be sure, although based chiefly on the activity required in the Park Square matter, covered also a volume of consultative work with chief counsel for R. F. C. on this and other matters. But these petitioners also, in addition to the conduct of these four pieces of litigation, gave much consultative assistance to chief counsel, which to the extent reasonably required for the proper safeguard of the underlying bonds was also compensable.

To be sure, of the four pieces of litigation just discussed, the contentions of the petitioners were ultimately sustained only in the Annett claim; on familiar principles their allowance on account of the other items must reflect the attendant lack of success. Nevertheless, an allowance of $10,000—the maximum set by the Commission—seems to me less than reasonable compensation for their thorough and competent conduct of these four cases, two of which included appeals to the Circuit Court of Appeals and one of which involved an opposition to certiorari. If, as seems clear, the mortgage trustee was justified in authorizing the position taken in these cases, surely a thorough conduct of each contest was warranted: no one will urge that the fiduciary obligations of the trus-

tee would have been discharged by nominal effort in anticipation of a judicial "whitewash". And trustees will be without means to discharge their essential function if restricted to the assistance of ·counsel who will serve on a contingent basis. Indeed, the theory of a contingent fee basis, if it is to attract competent counsel at all, generally imports an agreement for compensation, in the event of success, substantially more generous than would otherwise obtain. Obviously the recognition of such a fee basis in reorganization proceedings would be ill-advised. And so, even services in conducting litigation which results unsuccessfully are entitled to compensation at a rate which will subject counsel to no positive hardship.

In addition to the foregoing services, other time-consuming activity was given by these petitioners to the task of continuing scrutiny of petitions on administrative matters. This was done generally through a junior associate who attended the hearings and frequently requested that a showing of fact be made—even in the absence of any recorded opposition—to justify the stated recommendation of the court's trustees. I recall no specific case of this sort in which the action of the court was thereby materially affected: no pecuniary advantage to the general or the mortgaged estate seems thereby to have been accomplished. Yet I incline to the view that such service is compensable, though on a very modest basis, of course. For after all, the Bankruptcy Act is designed to afford room, at least, for creditor control: creditors are entitled to examine into the policies and efficiency of management under the court. Indeed, early in these proceedings at a general conference of the principal creditors I reminded them that the management was no longer under the supervision of an active Board of Directors and as a safeguard against possible encroachments of managerial inefficiency invited their watchful cooperation. Especially against this background, the continuous scrutiny thus afforded through these petitioners of the bases for all unusual expenditures may properly, I think, be charged against the estate. That is not to say that every party is entitled to be represented at routine hearings at the expense of the estate: the penalty of duplication is disallowance. But here the task has been carried on without any substantial duplication, and in an economical manner. And it was not inappropriate that the service should be furnished through the trustee under a system-mortgage whose fiduciary duties thus had a range almost as wide as the system.

I am unable to find, however, that this petition shows that there was no unnecessary duplication of labor. Both this petition and that of White and Case shows a large number of conferences between members of the two firms and considerable overlapping attendance in court proceedings. Perhaps some of this was reasonably necessary, but the record does not show the extent of such need. And left to proceed by inference, I can as readily attribute much of this conference and association to considerations of courtesy and lawyer-habit as to real necessity.

Certainly it is legitimate for a party deeply involved in litigation of wide scope to arrange for a division of the expected labor between two or more firms. But only as to exceptional matters is there need for more than one firm in the performance of a single task. In the situation which arose upon the bringing of the Massachusetts action against Bankers, I can readily perceive that a few conferences betwixt the three associated firms may well have been helpful. But in the ordinary task, including the great bulk of litigated matters, one responsible firm gains little,—except occasionally some gilding for his lily,—by outside consultations. Unless there is some convincing evidence to the contrary, such consultations may properly signify not that one firm has earned an additional fee but only that it is entitled to part of what would otherwise have been the other's fee.

Objection will be made that it is impossible, or unduly burdensome, for counsel to be held strictly to their burden of proof in such matters. But generally the retainer of associate counsel is warranted only as a means to subdivide the work. Associate counsel, if suitably selected and if the field of retainer is suitably defined, can surely be trusted to carry on the general run of activities entrusted to them without continuing supervision. And if in the absence of some exceptional situation counsel in charge seeks an outside conference for his own comfort, or counsel not in charge seeks by conference to improve the work entrusted to a competent outside associate, the resulting expense should be charged not to an insolvent.

estate but to considerations of the courtesy which happily prevails amongst members of the Bar and which I have no wish to disturb.

I should perhaps explain that I have thought it advisable to comment on this feature of the petition, not because I consider it one of major dimensions, but because I feel that now that I am asking the Commission to give further consideration to the petition, I should make it plain that while I do not question that much time was spent by these petitioners and their associates, I do not feel that the record in its present state demonstrates real need for all the time expended. And while it may be hard for the petitioners to prove the necessity for a multitude of conferences, it is impossible for the court to find the necessity without proofs.

### Goodwin, Procter & Hoar.

 This firm was retained as associate counsel for Bankers to prepare and conduct its defense against the Old Colony action brought against it in Massachusetts.

There is perhaps some question on the record whether certain time spent by these petitioners after the New Haven took over the defense of the Old Colony action is compensable. The questioned time is comparatively small and I will say only that on the whole it seems to me that from this questioned expenditure both Bankers and the estate probably had some benefit and that in my view the petitioners under the circumstances were warranted in the expenditure.

But quite apart from this questioned time—and it is not wholly clear to me that the item is indeed questioned—I think the maximum allowed by the Commission will not permit of reasonable compensation. For as my earlier comment shows the Old Colony action was not one in which any competent junior associate could be left to prepare the defense. It required research in a field remote from ordinary practice, the seasoned judgment of a legal historian to correlate and evaluate that research, and the skill of a legal practitioner to apply the essence of the research.

Since the showing made on this petition, unlike that on the two preceding petitions which were more comprehensive in their scope, is about as full as it well could be, I think it proper to say now that I should appraise the value of the services rendered at not less than $20,000. I must,

however, reserve the privilege of reappraisal in the light of any further comment which the Commission may make on the subject matter.

And indeed, in respect of each of these three petitions by counsel for Bankers which I am asking the Commission to reconsider, if the Commission shall reach a result at variance with views expressed herein I hope that I may have an opportunity to reconsider my views in the light of some exposition by the Commission on the bases for its conclusions more complete than that in its original report.

### Payment of Allowances.

All of the allowances made as above indicated may be paid forthwith from the New Haven estate, except those on account of services to the Old Colony estate, to the Old Colony trustees, and to Old Colony security-holders (or their representatives).

This important exception, which will have the effect of indefinitely postponing the payment of a number of substantial allowances, I feel constrained to impose because of the uncertain future and the existing lack of independent financial responsibility of the Old Colony estate; which is indebted in many millions to the New Haven for the expenses of its administration in bankruptcy and to the Commonwealth of Massachusetts, or subdivisions thereof, for taxes accrued during the period of bankruptcy. While there is room for argument that current taxes may be classified as an expense of administration (see Mr. Wurzel's article in Vol. 55, Harvard Law Review, pg. 1141) and hence entitled, perhaps, to share ratably in a liquidation with operating expenses and allowances, it seems to me neither wise nor fair to authorize New Haven funds to be advanced for the payment of Old Colony allowances while under my earlier order New Haven funds are not made available for the payment of Old Colony taxes.

I do not overlook the sustained effort of the so-called Compromise Committee in these proceedings to bring about by general consent a solution of the Old Colony problem which would permit all Old Colony expenses to be discharged, including taxes and allowances. But neither can I overlook the pending activity of the Attorney General of the Commonwealth in opposition to this proposed compromise arrangement. And until this feature of the situation is safeguarded in some approved plan;

I cannot take the responsibility for authorizing any advances to the Old Colony estate beyond those necessary to sustain its obligation to furnish the interim transportation service required by the Commonwealth.

### Other Petitions Denied.

██ In addition to the disallowances indicated above, I fully agree with the Commission that certain other petitions even when read in the light of the supporting evidence fail to show services or expenses which may properly be charged against the estate. These petitions are as follows: Committee composed of L. Stanley Champion et al. and its counsel; James L. Richards; Town of Scituate and its counsel; Charles S. Clark as attorney in fact for Town of Duxbury; Commonwealth of Massachusetts; Old Colony Commuters and Shippers League, its counsel and research director; Messrs. Kirshbaum & Wofsey; counsel for Provident Institution of Savings; and J. E. Walker.

Consistently with the Commission's Supplemental Order of January 21, 1942, an order will be entered denying the petitions of Tanzer and Mullaney and Robert P. Weil without prejudice to the renewal thereof in the event that the course of the proceedings herein shall warrant.

Counsel for the New Haven trustees will kindly submit for entry all proper orders to effectuate the rulings indicated herein.