In the Matter of the NEW YORK, NEW HAVEN & HARTFORD RAILROAD COMPANY, Debtor.

No. 30226.

United States District Court, D. Connecticut.

June 30, 1976.
Opinion Supplemented and Clarified, Aug. 23, 1976.

---

Professor James Moore, New Haven, Conn., for Trustee New York, New Haven & Hartford Railroad Co.

Kenneth G. Caplan, Interstate Commerce Commission, Washington, D. C., Joseph Auerbach, Sullivan & Worcester, Boston, Mass., for Trustee of the New York, New Haven & Hartford Railroad Co.

Richard Joyce Smith, Trustee, the New York, New Haven & Hartford Railroad Co., New York City.

Elaine Amendola, Zeldes, Needle & Cooper, Bridgeport, Conn., for Jacob D. Zeldes, successor indenture trustee under debtor's general income mortgage deed.

Lawrence W. Iannotti, Irving S. Schloss, Tyler, Cooper, Grant, Bowerman & Keefe, New Haven, Conn., for successor trustee under debtor's first and refunding mortgage, dated 7/1/47.

Stuart N. Scott, Joseph Schreiber, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for The Chase Manhattan Bank, N.A.

Albert X. Bader, Jr. and Horace J. McAfee, Simpson, Thacher & Bartlett, New York City, for Manufacturer's Hanover Trust Co.

Richard G. McClung, Carter, Ledyard & Milburn, New York City, for United States Trust Co. of New York.

Lester C. Migdal, Migdal, Tenney, Glass & Pollack, New York City, for First Mortgage 4% Bondholder's Committee.

Harry P. Lander, Bethany, Conn., for First Mortgage 4% Bondholder's Committee.

OPINION AND ORDER ON APPLICATIONS, PURSUANT TO § 77(c)(12) OF THE BANKRUPTCY ACT, FOR COMPENSATION AND FOR REIMBURSEMENT OF EXPENSES INCURRED ON BEHALF OF THE BANKRUPT ESTATE

ROBERT P. ANDERSON, Circuit Judge.*

On August 20, 1975 this court filed an opinion and order pursuant to which there were forwarded to the Interstate Commerce Commission (I.C.C.) certain applications for compensation for services and expenses, rendered and expended by the several applicants for the benefit of the Debtor's estate sometime between July 7, 1961, the date of the filing of the petition for reorganization of the New York, New Haven and Hartford Railroad Company (New Haven Railroad), and a date or dates shortly prior to the filing of the applications.

On February 5, 1976, the Railroad Revitalization and Regulatory Reform Act of 1976 (Public Law # 94–210) (RRRRA), which had been enacted by Congress, was signed by the President. Section 618(b) of the Act, among other things, provides that the powers and duties of the I.C.C. under § 77 of the Bankruptcy Act be terminated on the enactment of the RRRRA into law, as it related to any railroad in reorganization under § 77 but not subject to the Regional Rail Reorganization Act of 1973, 45 U.S.C. § 701 et seq. (the "Rail Act") and one which does not operate any line of railroad and which has transferred all or substantially all of its rail properties to a railroad in reorganization which was subject to the Rail Act prior to the enactment into law of the RRRRA.

The situation of the New Haven Railroad and the circumstances of its reorganization at that time brought it squarely within the provisions of § 618(b) of the RRRRA; and, pursuant to the provisions of that section, all of the powers and duties formerly in the I.C.C. to pass upon the above mentioned claims, vested in this court, as the reorganization court having jurisdiction over the New Haven Railroad, the Debtor, herein.

Therefore all of the applicants filed their claims in this court and have asked that they be allowed and paid. Hearings were held on the petitions on May 10, and June 1, 1976, and the petitions for compensation for services and the allowance of costs have been fully submitted and are presently in the hands of the reorganization court for determination.

The claims made by the parties are as follows:

UNITED STATES TRUST COMPANY OF NEW YORK, Trustee of the Debtor's Harlem River Division Mortgage

| | | |
|---|---|---|
| Fees: | $ 75,000.00 | |
| Expenses: | 12,775.36 | |
| | | $ 87,775.36 |

Carter, Ledyard & Milburn

| | | |
|---|---|---|
| Fees: | $ 700,000.00 | |
| Expenses: | 16,029.62 | |
| | | 716,029.62 |

FIRST MORTGAGE 4% BONDHOLDERS COMMITTEE

No separate fee or expenses are requested at this time.

Breed, Abbott & Morgan

| | | |
|---|---|---|
| Fees: | $ 76,663.20 | |
| Expenses: | 864.22 | |
| | | 77,527.42 |

Migdal, Tenney, Glass & Pollak

| | | |
|---|---|---|
| Fees: | $1,350,000.00 | |
| Expenses: | 47,766.88 | |
| | | 1,397,766.88 |

Harry P. Lander, Esq.

| | | |
|---|---|---|
| Fees: | $ 10,000.00 | |
| Expenses: | 1,400 00 | |
| | 11,400.00 | |

MANUFACTURERS HANOVER TRUST COMPANY as former indenture trustee for the First and Refunding 4% Mortgage Bonds

| | | |
|---|---|---|
| Fees: | $ 304,416.67 | |
| Expenses: | 103,018.34 | |
| | | 407,435.01 |

Simpson, Thacher & Bartlett

| | | |
|---|---|---|
| Fees: | $1,700,000.00 | |
| Expenses: | 15,234.81 | |
| | | 1,715,234.81 |

CHASE MANHATTAN BANK, N. A., as former indenture trustee under the General Income Mortgage Bonds

| | | |
|---|---|---|
| Fees: | $ 44,400.00 | |
| Expenses: | 84,648.83 | |
| | | 129,048.83 |

* Sitting by designation.

Dewey, Ballantine, Bushby, Palmer & Wood

| | | |
|---|---|---|
| Fees: | $ 791,513.00 | |
| | 45,176.00 | |
| Expenses: | 19,605.47 | |
| | | $856,294.47 |

LAWRENCE W. IANNOTTI, Successor Trustee under the Debtor's First and Refunding Mortgage

| | | |
|---|---|---|
| Fees: | $ 45,660.00 | 45,660.00 |

Tyler, Cooper, Grant, Bowerman & Keefe

| | | |
|---|---|---|
| Fees: | $ 30,540.00 | |
| Expenses: | 4,481.38 | |
| | | 35,021.38 |

JACOB D. ZELDES, Successor Indenture Trustee under Debtor's General Income Mortgage

Zeldes, Needle and Cooper, P.C.

| | | |
|---|---|---|
| Fees: | $ 33,971.00 | |
| Expenses: | 1,165.91 | |
| | | 35,136.91 |

■ The petitioners, of course, must bear the burden of proving that the services for which compensation is sought under § 77(c)(12), measurably benefited the estate and promoted the reorganization of the Debtor. *Woods v. City National Bank & Trust Company of Chicago,* 312 U.S. 262, 268, 61 S.Ct. 493, 85 L.Ed. 820 (1941) (Ch. X reorganization); *In re New York, N. H. & H. R. Co.,* 46 F.Supp. 214 (D.Conn.1942), *modified and aff'd sub nom. Warren v. Palmer,* 132 F.2d 665 (2 Cir. 1942); *In re Boston & Providence Railroad Corp.,* 428 F.2d 159, 164 (1 Cir. 1970); *In re Yale express System, Inc.,* 366 F.Supp. 1376 (S.D. N.Y.1973) (Ch. X reorganization); *Missouri Pacific R. R. Reorganization,* 212 I.C.C. 622, 665, *aff'd on reconsideration,* 217 I.C.C. 577 (1936). The services must have advanced the course of the reorganization and not impeded it, *In re Boston & Providence R. R.,* 260 F.Supp. 415, 422 (D.Mass.1966), *cert. denied,* 389 U.S. 974, 88 S.Ct. 475, 19 L.Ed.2d 467 (1967). Furthermore, it is the usual rule that they must not be cumulative, overlapping or duplicative of those of other claimants or services rendered by the reorganization trustee and his counsel. *Finn v. Childs Co.,* 181 F.2d 431 (2 Cir. 1950) (Ch. X reorganization); *In re New York, N. H. & H. R. Co., supra.*

■ A substantial portion of the expenses claimed by each of the petitioners is made up of its attorneys' fees and the attorneys' out-of-pocket expenses. The eligibility of the claims for attorneys' fees, rests upon the same general qualifications as do § 77(c)(12) claims generally, that is, the contribution by the attorney must provide a measurable benefit to the entire estate; it must be closely connected with the process of reorganization; and should be different from or more than a duplication of someone else's contribution.

From the date of the filing of the petition in reorganization, July 6, 1971, to the present time all issues of any substance which have arisen in the proceedings for the reorganization of the New Haven Railroad have been heard and decided by the same reorganization court, the United States District Court for the District of Connecticut. Beside the hearings in the district court there were two additional proceedings in which petitioners' counsel appeared: one was the appeal from the I.C. C.'s decision of the valuation of the property of the New Haven Railroad for the purpose of fixing the price to be paid by the Penn Central Railroad for that property which, pursuant to § 5 of the Interstate Commerce Act, was heard by a statutory three-judge court; and the other was the hearing to determine the value of the Grand Central Properties which was assigned by the reorganization court to a special master. The reorganization court was kept fully informed as to the three-judge court proceedings and its holding in the case. At that time both courts were of the opinion that the statutes required decisions by both courts. The Supreme Court's decision in the *New Haven Inclusion Cases,* 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970), however, ruled that after the Penn Central merger the three-judge court proceedings were no longer necessary. The special master's findings were submitted to the reorganization court, which studied them in detail, and approved and adopted them. All of the proceedings and activities upon which the petitioners' claims are based, took place before the same court and

the same judge who is now entertaining and passing upon these petitions—a circumstance which affords the court the opportunity to bring to bear upon the claims, first-hand observation and a direct line of sight on the relevant bases of evaluation.

 One of the above mentioned generally adopted principles which apply to cases of this kind, is that the services for which compensation is sought are not cumulative, overlapping, or duplicative of those of other claimants, particularly of the reorganization trustees of their counsel. On the other hand, this rule must not be applied so as to deny compensation altogether, to representatives of parties which the Bankruptcy Act contemplates should take an active part in reorganization proceedings, merely because on certain issues their various interests may converge. See *In re TMT Trailer Ferry, Inc.,* 434 F.2d 804, 807–08 (5 Cir. 1970); 6A Collier on Bankruptcy ¶ 13.10, at 967–69 (14th ed. 1972). Where different counsel contribute different or additional points of view on a given subject, even though all may be working toward a similar ultimate end, there is a benefit to the debtor's estate, at the very least, where the issues have been more fully defined or more thoroughly analyzed and presented. Such a benefit, when it occurs, may properly be recognized in the granting of allowances. Cf. *In re New York, Ontario and Western Railway Co.,* 171 F.Supp. 634, 639–40 (S.D.N.Y.1958). Where, on the other hand, one party does nothing more than repeat the position of another, the debtor should not be required to pay for the duplication of effort. See *In re New York, N. H. & H. R. Co., supra,* 46 F.Supp. at 222, 224.

Compared with some railroad reorganizations and comparable Chapter X cases, the number of claimants in the present case is not unusually great, but there are overlapping interests as well as divergent interests. The indenture trustees and their counsel, as well as the 4% Bondholders Committee, as the record clearly shows, exerted every effort to preserve the Debtor's estate and to achieve through the necessary litigation a reasonably fair valuation of the assets of the estate. During the periods within which they held their respective positions, the indenture trustees and the committee and their counsel participated in all of the hearings by briefs and arguments as well as by presentation of evidence where necessary, on the many occasions in which these objectives—*i. e.,* the preservation of the Debtor's estate and the achievement of a fair valuation—were at issue. The reorganization trustees [1] sought to pursue these same objectives but they were compelled to give a great deal of weight and consideration to the factor of the public interest which was heavily involved in keeping the transportation system of the New Haven Railroad in operation to avoid the devastating economic consequences to southern New England of a cessation of freight operations, in addition to the loss of jobs to well over 9,000 employees and the loss of transportation facilities to thousands of regular passengers. The reorganization proceedings started with an empty treasury. The federal government made a *loan* of $12,-500,000 which temporarily permitted the New Haven Railroad to continue its operations, but it must be borne in mind that, unlike the Government's present activities in relief of the railroads, the federal government did not by way of grant or similar assistance give the New Haven Railroad a single dollar. On December 31, 1968, in an action dictated primarily by the public interest, the transportation plant of the New Haven Railroad was conveyed to the Penn Central as the sole means of keeping the trains going. Meanwhile, from July 7, 1961 to December 31, 1968 the New Haven Railroad, to operate, had to live on its own flesh and did so. The assets, insufficient to cover the obligations under the two series of bonds were eroded and depleted to the

---

1. The three original trustees were Richard J. Smith, William J. Kirk, and Harry W. Dorigan. Shortly after the death of Trustee Dorigan, Trustee Kirk resigned on February 28, 1969 and

Trustee Smith became sole trustee on March 1, 1969 and has continued as sole trustee since that time.

extent of 65–70 million dollars in value. See *New Haven Inclusion Cases, supra.* In the face of these problems the petitioners presented the arguments for preserving the Debtor's estate with clarity and skill, based upon pains-taking and extremely helpful analyses.

The record shows that there were innumerable issues, mostly new and complex, which arose out of the effort, on the one hand, to preserve the Debtor's estate and, on the other, to satisfy the demands of the public interest. The court was constantly required to balance these interests and make the necessary decisions. Without the adversary presentations, the balancing process would have been very difficult, if not impossible.

Obviously the estate should not be charged for duplicated services, and, to the extent that there is such duplication, compensation for an overall contribution must be discounted. Likewise, legal services directed to advancing the separate and distinct interests of the attorneys' client-petitioner, and not the estate as a whole, must be disregarded. In the present case the services of petitioners' counsel were almost entirely directed at preserving and enhancing the value of the Debtor's estate. That this could result in an ultimately greater recovery by the petitioners themselves does not militate against a right to compensation. Any duplications of service among the petitioners or with the work of the reorganization trustees and their counsel were relatively small. It is apparent from the record that they made a conscious effort to avoid this. Though the positions and objectives of two or more of them and those of the reorganization trustees might parallel each other (in which case, by agreement, only one presentation would be made), the issues were usually so complex that different interpretations and approaches were available and were separately presented by the different petitioners. This afforded the court a thorough analysis of an issue from varying points of view, which was a great aid to the court and made a valuable contribution to the reorga-

nization proceedings. Any repetition or duplication involved, which did not serve any useful purpose, was in no instance substantial. To the extent that it did appear in the contribution of any petitioner or its counsel, it has been taken into account in fixing compensation.

On August 20, 1975 this court drafted and filed an opinion and order, ruling upon applications by the petitioners to exercise its general equity powers and order payment of interim compensation at that time. While the court declined because, under the law as it then stood, it was the duty and function of the I.C.C. to pass upon such claims, the court did, to a limited extent, discuss the claims for compensation and expenses. A portion of what was said then is repeated here:

"In this connection a principal claim of the petitioners for having rendered services of substantial benefit to the bankruptcy estate and in aid of the reorganization plan stems from their services in connection with the valuation of the property of the New Haven Railroad which was transferred to the Penn Central. The Trustees for the New Haven Railroad in reorganization had negotiated at length and in great detail with the Pennsylvania and New York Central Railroads in an effort to avoid lengthy and costly litigation. A tentative agreement was ultimately reached, in the amount of approximately $125,000,000, which the reorganization court authorized the Trustees of the New Haven to submit to the Commission on October 24, 1976 and which was subsequently approved by the Commission; but it was never submitted to the reorganization court.

Thereafter in the proceedings, the Trustees for the New Haven felt that, having made the tentative agreement, there would be some impropriety in their going back to the Railroads, which merged on February 1, 1968 as the Penn Central, to attempt to get a higher price. The court considered their position to be understandable and proper. See *New Haven Inclusion Cases,* 399 U.S. 392, 410 notes 45 and 46 [90 S.Ct. 2054, 26 L.Ed.2d 691]

(1970). The petitioners, however, were not bound by the agreement and, using the $125,000,000 of the agreement as a point of departure, they pressed for a higher price. Ultimately it was fixed by the courts at approximately $174,600,-000."

See *New Haven Inclusion Cases, supra.*

The I.C.C., after reviewing the agreement, fixed a value for the New Haven Railroad of $125,000,000. Afterward, certain errors were shown to have been made in this computation which had caused the value to be underestimated by about $24,-600,000. These errors were: (1) a double deduction of $16,200,000 for real estate taxes; (2) a failure to discount to present worth the expenses of liquidation, a factor which made a difference of $3,800,000; and (3) an increase of $4,600,000 in the appraisal of Bronx Yards by including the accidentally omitted feature of rail connection.

█ With regard to the amount of compensation which should be allowed, this must, of course, vary from case to case, depending upon the size, difficulty and complexity of the case and its issues, the need for the particular services performed by the petitioner and the nature and importance of the benefit which accrued to the estate and the reorganization proceedings. In the present case the contributions made by the attorneys in the context of a railroad reorganization which, barring a relatively small initial loan, had to continue operations without cash and without credit, took on particular importance. Recent decisions in this Circuit on the subject of calculating attorney's fees, as they may apply to the present case, have laid considerable emphasis on the hours spent by counsel in working on the case, his standing at the bar, as well as the standing of his opponents, the magnitude and complexity of the litigation, and the responsibility involved and the result achieved. *City of Detroit v. Grinnell Corp.,* 495 F.2d 448 (2 Cir. 1974); *Trans World Airlines, Inc. v. Hughes,* 312 F.Supp. 478 (S.D.N.Y.1970), *modified on appeal,* 449 F.2d 51 (2 Cir. 1971), *reversed on other grounds sub nom. Hughes Tool Co. v. Trans World Airlines, Inc.,* 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973). Outside of being a point of beginning and a rough initial indicator, time spent can, in itself, have no conclusive meaning. The contribution to the Debtor's estate and its reorganization must be judged in the light of the quality and value of the work produced.[2]

█ Allowances for compensation and expenses have usually been made in connection with an approved and confirmed plan of reorganization. *In re United Cigar Stores Co. of America,* 21 F.Supp. 869, 875 (S.D.N.Y.1937); *Savannah & A. Ry. Reorganization,* 228 I.C.C. 543, 558 (1938). But where there was sound reason to believe that the reorganization proceedings would not be concluded for a long period of time, the Commission in a recent case took the position that it was unfair to qualified claimants to be required to bear the burden of indefinite delay before being paid. In *Penn Central Transportation Co. Reorganization (Compensation),* 348 I.C.C. 50 (1975), it permitted interim allowances under § 77(c)(12) in advance of any reorganization plan proceedings. In the present case the reorganization trustee formulated and filed a plan with the I.C.C., but, after the merger with the Penn Central and after that Railroad went into reorganization, the New

---

2. The ABA Code of Professional Responsibility, DR–106B in pertinent part, mentions the factors to be considered as guides in determining the reasonableness of an attorney's fee:

"(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent."

Haven trustee's plan became dependent upon and subject to the reorganization plan of the Penn Central, which will not, in all probability, be filed and approved for a long time to come. Therefore, in fairness to the petitioners, the court is of the opinion that their petitions for allowances under § 77(c)(12) should be determined now.

Another factor which must be considered is the assertion by the petitioners that the expense for attorneys' fees, in the circumstances of this case, should be regarded as in the nature of contingent fees, which are usually somewhat higher than ordinary attorneys' fees because the attorney has agreed to look only to the gross amount recovered in the action and meanwhile to bear the costs and expenses of the litigation. If there is no recovery, he stands to lose whatever he has put into the case in services and money. The evidentiary material in the case does not show in express terms what fee arrangements were made by and between each of the petitioners and their counsel. Attorneys' fees are presented here as expenses of the petitioners, and there were implications by some that it was not contemplated that their attorneys would be left with a loss, but that the petitioners were first to seek reimbursement of attorneys' fees from the court under § 77(c)(12). There does appear to have been a contingent fee aspect to the attorney-petitioner arrangement in the cases of the First Mortgage 4% Bondholders Committee, the Manufacturers Hanover Trust Company and the Chase Manhattan Bank, N.A., and in due course, consideration will be given to it. While the attorneys for the petitioners participated in the proceedings leading up to and including the procuring of a judgment of the Supreme Court of the United States, fixing the amount due by the Penn Central to the New Haven Railroad for the inclusion of the property of the New Haven at $174,600,000, that sum has not been paid and is due with interest. There is, therefore, no recovery in money against which a contingent fee can be measured. It will be necessary for this court to reserve jurisdiction on that matter.

There are a few other matters of general application which concern the compensation for services and expenses. It will be noted that the court has disallowed the very large sums, mostly hours of work by attorneys and clerical and secretarial assistance in preparing the applications for fees and expenses for presentation to the I.C.C. in compliance with its detailed specifications under Rule 51 of the I.C.C.; 49 C.F.R. § 1100.51. The court has no such elaborate requirements. It is sufficient if the applications reflect the time records, nature of work performed at those times, the rates of compensation, and moneys received and expended and the reasons for them; and it should appear that the records are accurate and are such as are kept by a prudent attorney in the regular course of his practice. It is not customary for an attorney to make a special charge for drafting a bill and presenting it to his client. The I.C.C. created a special set of requirements and, in view of it, allowed the charge in several cases; in others, inexplicably, it did not. There is no reason, however, why that item of cost should be borne by the Debtor's estate.

The court made an estimate of the portions of the claimed attorneys' fees, charged on the basis of current rates of pay rather than the rates which obtained for like work when the work was performed. In its computations the court made adjustments so that the latter standard would prevail. It is true that there was no allowance for interest, and there ordinarily would be some justification for seeking payment of past charges in terms of present dollar values.

In this case, however the opposite rule must prevail. From time to time, as long ago as seven or eight years, the court formally and informally suggested that the petitioners prepare and file their claims for compensation and expenses but this was never done. Some discretion as to filing the claims was left with the lawyers, but no reason was ever given at the time to explain why they did not do so.

In each of the computations for services of indenture trustees and counsel,

the first or basic estimate concerned "watchdog services." Allowances for such activities are proper. An indenture trustee serves in a fiduciary capacity, *Woods, supra*; see the Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa *et seq.*, and is under a duty to look out for the bondholders' interests in reorganization and to guard the value of the assets underlying those interests. It also means that the trustee must "keep informed of [the reorganization] proceedings and participate therein," *In re Hudson & Manhattan Railroad Company*, 224 F.Supp. 815, 829 (S.D.N.Y.1963), *modified on other grounds*, 339 F.2d 114 (2 Cir. 1964), and to offer suggestions and otherwise intervene where necessary to perform its functions. Generally such services aid the administration of the estate and the reorganization of the debtor, and may be compensated out of the estate. See *In re New York, Ontario and Western Railway Co., supra*, 171 F.Supp. at 637–38, 639–40.

With regard to the First Mortgage 4% Bondholders Committee and its counsel, the Migdal, Tenney firm, it should be noted that they are, in effect, only volunteers and are not acting in pursuance of a fiduciary duty as the indenture trustees are. The Committee is not entitled to receive compensation or reimbursement of expenses for "watchdog" services, as such. The Bondholders Committee was likewise so limited in regard to the expense of counsel fees during the period when Breed, Abbott & Morgan served as its attorney.

The Committee has now moved to file a claim for its expenses, July 8, 1961—December 31, 1973. Not having previously made a timely filing, the motion is denied.

The court has considered the question of unnecessary duplication of proffered benefits to the New Haven estate by two or more petitioners and has discussed it, *supra*. Where the court has been of the opinion that some duplication has occurred in situations where a petitioner has duplicated the work of the reorganization trustee or his counsel or the work of another petitioner who is carrying the main burden on the issue, some deduction has been made from the claim of the duplicator.

The court made reference, above, to the enactment of the RRRRA of 1976, which became law on February 5, 1976. On April 14, 1976 in ruling on the effect of the new law, the court held in Order # 795(A)(B) and (C) that all of the powers and duties formerly in the I.C.C. to pass upon claims made for services and expenses under § 77(c)(12) against the estate of the New Haven Railroad in reorganization vested in this court, and this is so regardless of whether the services were rendered and the expenses were incurred before or after the date on which the RRRRA of 1976 became law.

This court will now briefly summarize in general terms the major contributions made by each of the petitioners, and their respective counsel, for the benefit of the Debtor's estate and, with regard to each, the fair and reasonable compensation and the reimbursement of expenses which are allowed.

1. *UNITED STATES TRUST COMPANY OF NEW YORK*, Trustee of the Debtor's Harlem River Division Mortgage under the Debtor's Indenture of First Mortgage dated January 1, 1953.

The evidentiary material shows that United States Trust Company incurred and expended $275.36 in expenses connected with its services on behalf of the Debtor's estate, and that neither the nature nor amount of these expenses is contested. The court finds that the expenses were made, as alleged, that they were reasonable and necessary and they are approved and allowed under § 77(c)(12), and are ordered reimbursed as hereinafter set forth.

The evidentiary material further shows that United States Trust Company incurred and expended $12,500 in payment for the services of H S Equities, Inc., successor to Hayden, Stone Incorporated, an investment banking firm, for services rendered from November, 1967 through April, 1968, as consulting economists and investment counselors, specializing in railroad securities. The court finds that this fee was incurred in the

course of affording United States Trust Company additional information and education to enable it to perform its duty as trustee. It was chiefly for the purpose of protecting and enhancing the safety and value of the Harlem River Division Bonds, and is not chargeable to the Debtor's estate.

United States Trust Company, among other things, cooperated with the Debtor's estate in attempts to obtain tax relief from state authorities, and in the construction of necessary betterments to railroad property. It met with its counsel and representatives of the Debtor to discuss a bond purchase program which would simplify the Debtor's financial structure and generally benefit participants in these proceedings. It also reviewed the question of using funds on deposit with it, as trustee, for the open market purchase and retirement of Harlem River Division bonds. It examined appraisals and agreements in connection with its participation in the sale for $1,205,000 of certain property subject to the Harlem River Division mortgage. It drafted, with the assistance of its counsel, the indenture for the Bonds assumed by the Penn Central.

While the court is satisfied that the United States Trust Company made a valuable contribution to the Debtor's estate in advocating and promoting the assumption by the Penn Central of the Harlem River mortgage debt, a substantial proportion of the effort and skill was devoted to protecting and enhancing the safety and value of the bonds for the direct benefit of the Harlem River Division bondholders, who should bear some of the expense. The court also finds that the representations set forth in the Trust Company's Exhibit C of its petition for allowances for compensation and expenses, dated June 12, 1975, *i. e.,* the affidavit of J. Sinclair Armstrong, Executive Vice President of United States Trust Company of New York, are true but, as stated in the affidavit, "[the] valuation of reasonable compensation for the Trust Company's services is based upon the substantial benefits which have accrued to the Debtor and to the Harlem River Division bondholders . . . ." It is the opinion

of the court, therefore, that the fair share of the claim to be paid by the Debtor's estate as hereinafter set forth is $45,000.

1(a). *Carter, Ledyard & Milburn,* counsel for United States Trust Company, July 7, 1961—April 1, 1975.

The evidentiary material shows that counsel incurred and expended $15,182.40 in connection with its services on behalf of the Debtor's estate, and that neither the nature nor amount of these expenses is contested. The court finds that the expenses were made as alleged, that they were reasonable and necessary and they are approved and allowed under § 77(c)(12), and are ordered reimbursed, as hereinafter set forth.

In Exhibit A of the petition for compensation—the affidavit of Mr. Kernan which the court finds to be true—the firm of Carter, Ledyard & Milburn describe, *inter alia,* the most significant contributions made by them to the Debtor's estate. These are their separate and distinct efforts in connection with (1) the assumption of the Harlem River Division Bonds by the Penn Central; (2) the increase of $4,600,000 in the valuation of the Bronx freight yards brought about by the discovery on the second round of Commission hearings that the real estate valuation witness, Mr. McCann, had assumed lack of rail services to the Bronx freight yards; (3) the defeat of "six-months" claimants for priority status; (4) the prompt inclusion of the Debtor in the merger of the Pennsylvania and New York Central Railroads; and (5) the sale of a portion of the Oak Point Yard, which was subject to the Harlem River Division mortgage, with the result that the $1,205,000 proceeds from the sale are deposited in the registry of this court where they are now held, thus creating a fund which inures to the benefit of the Debtor's estate.

As stated by the court in ruling on the petition of the United States Trust Company, *supra,* a valuable contribution to the Debtor's estate resulted from the assumption by the Penn Central of the Harlem River mortgage debt, but a substantial proportion of the effort and skill was devoted to protecting and enhancing the safety and

value of the bonds for the direct benefit of the Harlem River Division bondholders, who should bear some of the expense. This statement applies equally well to the United States Trust Company's counsel's participation in the litigation concerning the "six-months" claimants for priority status. They took an active part in this and contributed to its success, but the main responsibility for this litigation rested on Simpson, Thacher & Bartlett, together with counsel for the reorganization trustees.

After taking into consideration (a) the change in value of the dollar between 1969, the date when the court suggested the parties submit their claims for compensation, and 1975; (b) any alleged unnecessary duplication of services by counsel for the respective petitioners; and (c) the benefit to the Debtor's estate, as a whole, it is the opinion of the court that the fair share to be paid by the Debtor's estate, as hereinafter set forth, of the claim by Carter, Ledyard & Milburn for compensation for the services rendered in this case is $450,000. It is a complete and final fee and it carries with it no contingency fee interest or rights.

### 2. THE FIRST MORTGAGE, 4% BONDHOLDERS COMMITTEE.

No application has been made for services or expenses on behalf of the Committee, itself, and none is allowed.

2(a). *Breed, Abbott & Morgan,* counsel for the First Mortgage 4% Bondholders Committee, July 8, 1961—October 10, 1966.

The court finds that counsel's expenses in the amount of $864.22 were incurred in connection with the services of counsel, rendered for the benefit of the estate of the Debtor, the New Haven Railroad in reorganization, and that they were reasonable and necessary. They are, therefore, approved for payment under § 77(c)(12) and are ordered reimbursed to counsel as hereinafter set forth.

With regard to the attorneys' claim for services, the court accepts as true the representations and statements made in that portion of their affidavit which details the work performed. There is a grave difficulty however, involved in it, which stems from the fact that services rendered exclusively for the benefit of the 4% Bondholders Committee are indiscriminately merged and intermingled with those rendered for the benefit of the bankruptcy estate of the New Haven as a whole. It is only the latter which are compensable out of the funds of the Debtor.

Out of all of the items of service mentioned, about one-half can be said to have been of general benefit to the New Haven estate in its entirety. Weighing these in the light of their nature and importance the court concludes that just and fair compensation for the services performed is $42,000 which is to be paid out of the Debtor's estate as hereinafter set forth.

2(b). *Migdal, Tenney, Glass & Pollack,* counsel for the First Mortgage 4% Bondholders Committee, October 20, 1966—December 31, 1973.

The evidentiary material shows that counsel incurred and expended $47,766.88 in expenses connected with its services on behalf of the Debtor's estate, and that neither the nature nor amount of these expenses is contested. The court finds that, except for fees and expenses incurred in connection with the Penn Central reorganization proceedings (or the New Haven Railroad's interest therein) in the Eastern District of Pennsylvania, which are disallowed, the expenses were made as alleged, that they were reasonable and necessary and are approved and allowed under § 77(c)(12), and are ordered reimbursed in the amount of $43,560.88 as hereinafter set forth.

The Migdal, Tenney firm succeeded the firm of Breed, Abbott & Morgan, who were counsel for the Committee July 8, 1961—October 10, 1966. At that time the New Haven Railroad reorganization proceedings had been going on for more than five and one-half years. It was necessary that the newly retained counsel thoroughly familiarize themselves with the history and records of the proceedings up to that time and to weigh and consider the condition of the Debtor and the prospects for a successful

reorganization. They noted the rapid erosion of the assets of the Debtor due to continuing operational losses. The I.C.C. had approved the Penn Central merger subject to the condition that the New Haven Railroad be included "on fair and equitable terms." The reorganization trustees had entered into a purchase agreement with the Pennsylvania and New York Central Railroads, and counsel for the Committee made a study and analysis of the agreement. They objected to several of its provisions. They brought a suit in the United States District Court for the Southern District of New York seeking to enjoin the merger unless the New Haven was simultaneously included and unless adequate traffic protective conditions were imposed upon the Penn Central and parties participating in the *Penn Central Merger Cases,* 389 U.S. 486, 88 S.Ct. 602, 19 L.Ed.2d 723 (1968), both of which affected the Debtor's estate and contributed to the latter's enhancement of its value. All of these activities on the part of the Committee's counsel were designed to influence the reorganization in a direction which would stem the continuing losses and enhance the value of the assets. The reorganization trustees and the indenture trustees and their counsel were pursuing the same objectives but their arguments and the means proposed were not the same and there was little duplication in the proposals and arguments. After the Commission's review and report, its determination was certified to the reorganization court for review. Among the points raised, the Committee's counsel objected that the New Haven's interest in the Grand Central Terminal properties was improperly defined. They sought permission from the reorganization court to commence a plenary action in the courts of the State of New York to determine the rights of the New Haven in these properties. Because such an action could not be concluded in less than four or five years, the court in response denied that motion. Later, however, the court appointed a special master to make findings and report on this issue. The reorganization court adopted the special master's conclusions which enhanced the Debtor's position.

At the time the I.C.C. issued its Fourth Supplemental Report, the 4% Bondholders Committee and the other creditors brought an action before the three-judge court protesting the inadequacy of the increase granted by the Commission in this latest report, which was also certified to the reorganization court for review. The counsel for the Committee argued certain distinct objections to the Fourth Supplemental Report and the decision by the Commission, before both courts. The judgments of the three-judge court and the reorganization court each increased the purchase price for the New Haven substantially. The Committee's counsel subsequently appealed from the judgments of both courts, as did others of the creditors, and counsel argued before the Supreme Court the point that the underwriting provision in the reorganization court's judgment did not provide a proper equivalent for the property turned over by the New Haven to Penn Central. The case was argued before the Supreme Court by counsel's senior partner, Mr. Migdal, with Mr. Seymour, senior partner of counsel for the indenture trustee under the First and Refunding Mortgage Bonds and by special counsel, Mr. Auerbach, for the reorganization trustees. The Supreme Court resolved the matter of having two courts adjudicating the price issue and declared that the three-judge court under § 5 of the Interstate Commerce Act was not required under these circumstances and set aside its judment.

Important but different arguments were made by the three counsel. Mr. Migdal made the rebuttal argument. The judgment of the reorganization court was affirmed in part but vacated and remanded in part for further consideration of the form and nature of the payment by the Penn Central to the New Haven Railroad for its assets.

In the early stages of the inclusion proceedings there were negotiations between the New Haven Railroad creditors and the Pennsylvania and New York Central Railroads seeking a settlement of the pending issue. Mr. Migdal acted as lead counsel for

the creditors in these negotiations. The negotiations did not succeed. The reorganization trustees of the New Haven Railroad did not participate as they felt bound by the agreement made with the two Railroads. The offer made by the Railroads was less than what the New Haven Railroad creditors were willing to accept and the judgment subsequently awarded by the Supreme Court was greatly in excess of any offer made to the creditors.

Pursuant to an order of this court, the reorganization trustees, in September, 1967, were authorized to file the second step of the two-step plan of reorganization with the I.C.C. Problems arose as to possible inferences which might be drawn from the form in which the order was issued. The Bondholders Committee through its counsel appealed to the Second Circuit which modified the order as the Committee requested. Subsequently the I.C.C. issued its report following evidentiary hearings on "Step II" of the plan of reorganization. These hearings were followed by the Commission's report which also contained the I.C.C.'s reconsideration of the purchase price issue remanded to it by the reorganization court and the three-judge court and the issue of the approval of "Step II." When the plan was certified to this court, counsel for the Committee raised questions as to various portions of it, which the court found had merit, but it refused to pass upon the plan until final resolution of the amount to be paid by the Penn Central for the New Haven Railroad's assets had been made. The Committee's counsel participated in many occasions in conferences with counsel for the reorganization trustees and with counsel for the indenture trustees about various details of the proposed plan of reorganization and they made constructive suggestions with respect to the provisions of the plan and the tax consequences which would flow from it. Subsequent to the Penn Central's going into reorganization and the filing of the decision of the Supreme Court in the *New Haven Inclusion Cases,* they followed closely the Penn Central reorganization as it affected or as it was likely to affect the interests of the New Haven Railroad's estate. Although it was not granted leave to intervene in the Penn Central proceedings, it made suggestions or recommendations directly to the New Haven Railroad's trustee for his consideration.

After October 10, 1966 there were before the court no issues of significant importance relating to the New Haven Railroad's reorganization and its efforts to preserve and enhance its assets in which counsel for the 4% Bondholders Committee was not heard or did not participate. While neither the reorganization court nor the reorganization trustee and his counsel, and the indenture trustees and their respective counsel were in full agreement, nevertheless the Debtor's estate and the course of the reorganization were benefited by the constructive and informed criticism for and against the many proposals which arose out of the myriad of complex issues in the case.

In general the Committee's counsel's narrative account of their activities is found by the court to be a correct statement of their participation in this reorganization and the fair and reasonable value of those services in this case is $632,015, plus such contingent addition as may later eventuate in accordance with a provision hereinafter recited.

2(c). There is incorporated into the claims for counsel fees filed by the First Mortgage 4% Bondholders Committee, the claim of Harry P. Lander, Esq., of New Haven, Connecticut, who was retained by the firms of Breed, Abbott & Morgan and Migdal, Tenney, Glass & Pollack as their representative Connecticut counsel. Mr. Lander's fees for services are fixed by the court at $2,000 and his out-of-pocket expenses at $900. These fees and expenses are to be paid out of the Debtor's estate as hereinafter set forth.

■ 3. *MANUFACTURERS HANOVER TRUST COMPANY,* as Indenture Trustee for the Debtor's First and Refunding Mortgage.

With regard to the expenses incurred by the indenture trustee, none of the items has been contested. It is noted that, as set out

in the affidavit of Mr. Kaestnor, a Senior Vice President of the petitioner, the item of $91,398.26, an advance to Simpson, Thacher & Bartlett, has been properly deleted because it is reimbursable. The court finds the account of the sums expended is correct and that they were reasonable and necessary. They are, therefore, approved and allowed under § 77(c)(12), and ordered to be paid as hereinafter set forth by the reorganization trustee to the petitioner in the amount of $103,018.34.

As far as services of the Manufacturers Hanover Trust Company as indenture trustee are concerned, the court would, on careful review, ordinarily find that there was sufficient unchallenged and competent evidence to qualify them as legitimate charges *except* for the fact that, subsequent to the Penn Central's filing of its petition in reorganization while the Manufacturers Hanover Trust Company was acting as indenture trustee for the New Haven's First and Refunding Mortgage (from which position it resigned on June 21, 1971), it was required as indenture trustee for New York Central and/or Pennsylvania Railroad bonds to take certain actions *against* the interests of the estate of the New Haven Railroad in bankruptcy and did so. The circumstances were described in this court's opinion and order of August 20, 1975 in this case, which are repeated as follows:

"It appears that Manufacturers, as indenture trustee for the New Haven's First and Refunding Mortgage, was on December 31, 1968 also indenture trustee for 18 mortgages of the New York Central and/or the Pennsylvania Railroads then merged into the Penn Central Transportation Company. This circumstance produced no conflicts between the interests of the various bondholders until after the Penn Central filed its application for reorganization on June 21, 1970 and after the Supreme Court decision in the *New Haven Inclusion Cases* on June 29, 1970. In August, 1970 the New Haven reorganization court called for statements of position by the parties in interest relative to the remand ordered by the Supreme Court in the *Inclusion Cases.* There

arose at that time an important issue in which the Manufacturers, as indenture trustee for the New Haven's First and Refunding Mortgage and represented by the Simpson, Thacher firm of attorneys, was sharply at odds with the Manufacturers, as indenture trustee of the New York Central and Hudson River Railroad Company Gold Bond mortgage [in which capacity the same trust company was] represented by the Kelley, Drye firm of attorneys. On June 21, 1971 Manufacturers resigned as indenture trustee for the First and Refunding Mortgage of the New Haven. As recently as July 21, 1975, the Manufacturers sought leave of the United States District Court for the Eastern District of Pennsylvania to resign as indenture trustee for New York Central and Hudson River Railroad Company Gold Bond mortgage dated June 1, 1897, because of potential conflict with its former position as indenture trustee for the New Haven mortgage. So far as is known, Manufacturers continues to act as indenture trustee for the 17 remaining mortgages. The Commission, therefore, will have before it for a finding, the factual issue of whether there has been and continues to be a conflict in interest on the part of the Manufacturers as former indenture trustee for the New Haven's First and Refunding Mortgage and as indenture trustee for the New York Central and/or Pennsylvania Railroad mortgages, and whether, if such conflict has existed, it has impeded or impedes in any way the New Haven reorganization."

The Manufacturers Hanover's petition to the Penn Central reorganization court to resign as indenture trustee for the New York Central and Hudson River Railroad Company Gold Bond Mortgage, dated June 1, 1897, was granted by the Penn Central reorganization court. It is undisputed that Manufacturers Hanover Trust Company is continuing to act as indenture trustee for each of the several bond issues of the New York Central and/or Pennsylvania Railroads which have interests contrary to those

of the estate of the New Haven Railroad in reorganization. Moreover, the Manufacturers Hanover Trust Company, as indenture trustee of the New York Central and/or Pennsylvania Railroad bond issues, is of the opinion that it still has a duty to assert, on behalf of the bondholders of those issues, claims contrary to the interests of the New Haven estate, so long as it is in the interests of and the desire of the New York Central and/or Pennsylvania Railroad bondholders to do so.

The court finds that after the filing by the Penn Central of its petition for reorganization on June 21, 1970 and the filing of the judgment of the Supreme Court in the *Inclusion Cases* on June 29, 1970, the Manufacturers Hanover Trust Company, as indenture trustee for the New Haven Railroad's first mortgage bonds for nearly 25 years, 1941–1971, faced a conflict of interest with its position as indenture trustee for the New York Central and Hudson River Railroad Company Gold Bond Mortgage as well as it did with its position as indenture trustee for the 17 other New York Central and/or Pennsylvania Railroad bond issues. This was dramatized by the successful action which Manufacturers Hanover, as indenture trustee for the Gold Bonds, brought, through the attorneys for its trust department, Kelley, Drye, Warren, Clark, Carr & Ellis, against the New Haven reorganization trustee on the ground that the New Haven reorganization court lacked jurisdiction, on remand of the *Inclusion Cases* by the Supreme Court, to pass upon the secured status of the New Haven's claim for payment for the New Haven's sale and transfer of its operating property.

The evidence shows that the Chairman of the Board of Manufacturers Hanover Trust Company was of the opinion that the Trust Company had become disqualified to continue to act as indenture trustee for all of the bond issues in question, *i. e.* both that of the New Haven and the 18 of the New York Central and/or Pennsylvania Railroads, and he so advised the appropriate officers of the Trust Company. The court is in entire agreement with that opinion. Although the

Manufacturers Hanover, in apparent good faith, sought to resign from all of them and at the same time went to extraordinary lengths throughout the eastern United States to get qualified corporate banks to agree to act as successor indenture trustees, it was unable to do so. It did find a successor for the Gold Bond issue and on September 4, 1975 the Manufacturers Hanover's resignation, as indenture trustee for the Gold Bonds, was accepted by the Penn Central reorganization court and the successor indenture trustee was appointed. The New Haven reorganization court ran into the same problem when, by the most diligent and thorough searches and inquiries by the Manufacturers Hanover Trust Company, Simpson, Thacher & Bartlett, its counsel, and the New Haven reorganization trustee(s) and their counsel no bank could be found to act as successor trustee for the New Haven's first and refunding mortgage bonds. Although the underlying mortgage itself specified that a successor trustee must be a qualified bank, the court, on the basic principal that it cannot permit a valid trust to fail for lack of a trustee, appointed Lawrence W. Iannotti, Esquire, a qualified practicing lawyer in New Haven, Connecticut, as successor indenture trustee under the first and refunding mortgage 4% bond issue of the New Haven Railroad. Later in January, 1972, when the Chase Manhattan Bank, N.A., resigned, because it was a creditor of the Penn Central, the court appointed Jacob D. Zeldes, Esquire, a qualified practising lawyer in Bridgeport, Connecticut, as successor indenture trustee under the New Haven Railroad's general mortgage (second series income bonds). This is not to suggest that a similar course should have been followed in the cases of the remaining 17 New York Central and/or Pennsylvania Railroad bond issues. For what it is worth, it is the opinion of this court that, considering the size and complexity of the Penn Central reorganization, such an arrangement would probably be entirely impractical. It is also understandable that those carrying on the reorganization proceedings of the Penn Central would probably not rise to their feet with unanimous

outbursts of enthusiasm to see 17 new successor trustees with 17 new counsel enter the ballpark. Nevertheless the prospect of more problems superimposed upon already existing ones of immense difficulty cannot operate to condone a breach of fiduciary duty or justify it. ·

Simpson, Thacher & Bartlett, as Manufacturers Hanover's counsel, argue there was no ·breach of fiduciary duty by the Trust Company for these reasons:

Where a bank, such as the Manufacturers Hanover Trust Company, is trustee under two separate trusts and the cestuis of the two trusts are on opposite sides of a controversy involving the interests of the trusts, the bank can avoid responsibility for a breach of fiduciary duty if it arranges to have counsel for one department of the bank appear in the controversy in the name of the bank, on the side of one cestui (the New Haven); and also arranges to have counsel for another department of the bank appear in the controversy in the name of the bank on the side of the other cestui (the Penn Central). In its reply brief it said,

"Admittedly, a potential conflict of interest existed, which Manufacturers had already recognized and sought to avert. The essence of the problem Manufacturers faced was that it ran the risk of breaching its fiduciary duty to one group of bondholders or the other if it failed fully to represent their interests during the time before it could resign."

It, therefore, weighed the relative risks of liability if it took or appeared to take one side or the other between the two cestuis; its first solution was to assign one of its lawyers to one side and another one of its lawyers to the other. The startling result was that, on opening court one morning, the New Haven reorganization court was handed a brief by the Simpson, Thacher firm from Manufacturers Hanover Trust Company for the New Haven side of the case, and it was then handed another brief by the Kelley, Drye firm from the Manufacturers Hanover Trust Company for the other side of the same case. This may have been (to adapt a remark by Prof. Freund)

an exercise of the delicate art of threading that fine line "between partiality on the one hand and impartiality on the other." But it was not proper action by an indenture trustee. Manufacturers Hanover should have resigned from both, as its Chairman had said, but apparently no one felt the necessity of following through on his admonition. Even though the Manufacturers Hanover is a very large banking institution, it cannot be excused by saying that it was so large its right hand could not know what its left hand was doing nor could it be excused by doing through its attorneys, and agents what it was forbidden to do as a corporate person. Its next solution was to resign from the indenture of the New Haven and much later, after being granted leave by the Penn Central reorganization court, it resigned as indenture trustee for the Gold Bond mortgage bonds. Meanwhile it has continued as indenture trustee for the remaining New York Central and/or Pennsylvania Railroad bond issues.

In its capacity as the indenture trustee for these 17 issues, it asserts that it is its duty to oppose the claim of the New Haven reorganization trustee. Manufacturers Hanover's counsel in its brief makes reference to the New Haven reorganization trustee's citation of *Woods v. City National Bank & Trust Company of Chicago, supra,* in support of the disqualification of Manufacturers Hanover Trust Company as indenture trustee for the New York Central and/or Pennsylvania Railroad bonds; but, · as counsel for the Trust Company, Simpson, Thacher asserts that there was no breach of fiduciary duty, and says:

"The [New Haven reorganization t]rustee's discussion of the conflicts question is based on *Woods v. City Nat'l Bank & Trust Co.,* 312 U.S. 262, [61 S.Ct. 493, 85 L.Ed. 820] (1941). As the Trustee notes, 'the essential basis for the disallowance of these claims by the reorganization court was that the claimants were pursuing interests of their own that were either of no benefit to the estate or, more often, were adverse to it.' (Trustee's Statement, at 24). *Woods,* therefore, is inap-

posite since Manufacturers neither pursued any interest of its own nor pursued any interest adverse to the estate."

But it has "pursued [an] interest adverse to the New Haven estate" in pursuing the interests of the 18 New York Central and/or Pennsylvania Railroad indentures and it declares it has a duty to continue to do so. That is precisely what it has been doing over the past five years, and the *Woods* case declares it to be a breach of fiduciary duty. The law does not countenance such activity by a fiduciary—even an indenture trustee. *Woods v. City National Bank & Trust Company of Chicago, supra; In re Boston & Providence Corp., supra,* 260 F.Supp. at 422.

Too much, of course, should not be read into or inferred from such phrases as "breach of fiduciary trust" or "disqualified . . . as indenture trustee". Such descriptive words do not say or imply that the Trust Company indulged in any conduct of a criminal nature or sought in any way to take or use other persons' property for its own use, or otherwise acquire any personal gain for itself. The Manufacturers Hanover Trust Company, through no action of its own, found itself in a position between conflicting interests, as to each of which it was in a position of indenture trustee. It could not help one without hurting the other.

The Trust Company, as indenture trustee for the New York Central and/or Pennsylvania Railroad indentures did speak of resigning but was dissuaded from doing so. It never took a strong stand for that proposition and never, when contemplating its dilemma, refused to serve, following this stand by pressing for or seeking an authoritative court declaration of its rights and duties, as it should have done.

While it is clear that the breach of fiduciary duty by the Manufacturers Hanover to the New Haven's first mortgage bondholders has impeded, and therefore damaged, the New Haven reorganization trustee's collection of the sums owed the New Haven estate from the Penn Central for the transferred properties of the New Haven and has frustrated the further development of a plan of reorganization for the New Haven, the extent of such damage cannot be ascertained at the present time. Its measure turns on the amount of money which the New Haven estate will receive in payment of the Supreme Court's judgment on the price to be paid by the Penn Central for the New Haven property. If the principal amount of that purchase price is paid in full, the damage from the Manufacturers Hanover's breach of trust would be trivial and de minimus. If no money were received by the New Haven on the purchase price, the damage would greatly exceed the full amount of the Manufacturers Hanover claim for services and expenses. If the purchase price payment were ultimately to fall somewhere between nothing and the entire amount due under the terms of the judgment, the measure of the damage inflicted by the Manufacturers Hanover would go inversely up or down accordingly. The court finds that the Manufacturers Hanover Trust Company, as indenture trustee for the New Haven's First and Refunding Mortgage bonds, breached its fiduciary duty to the New Haven estate in reorganization and has damaged it. While *Woods v. City National Bank & Trust Company of Chicago, supra,* authorized a complete disallowance of fees for services and reimbursement of expenses, later cases in this Circuit and others have tempered this somewhat. See, *Berner v. Equitable Office Building Corp.,* 175 F.2d 218 (2 Cir. 1949); *Silbiger v. Prudence Bonds Corp.,* 180 F.2d 917 (2 Cir.), cert. denied 340 U.S. 813, 71 S.Ct. 40, 95 L.Ed. 597 (1950); *Chicago & West Towns Rys. v. Friedman,* 230 F.2d 364 (7 Cir.), cert. denied 351 U.S. 943, 76 S.Ct. 837, 100 L.Ed. 1469 (1956).

This court will allow Manufacturers Hanover Trust Company's claim for reimbursement of expenses in full. There has been no objection to them, qua proper expenditures, they are found to have been reasonable and necessary and they may be paid out of the debtor's estate in the amount of $103,018.34 as hereinafter directed.

In lieu of an absolute disallowance or reduction of the Trust Company's petition

for *a fee* for services as indenture trustee for the New Haven's First and Refunding Mortgage, the court will deal with its petition as follows:

The Trust Company's claim for services rendered in the amount of $304,416.67, or any recoverable part of it, is ordered to be treated as contingent. The Manufacturers Hanover Trust Company is ordered to accept in full accord and satisfaction of the claimed sum and any and all claims for services, rendered by it as indenture trustee for the New Haven's First and Refunding Mortgage in any manner whatsoever, one-quarter (¼) of one per cent. (1%) of all payments made on and after the date of this judgment, to the New Haven estate in reorganization, for and on account of the purchase price, to be paid by the Penn Central for properties of the New Haven, as fixed by the judgment of the Supreme Court in the *Inclusion Cases.* Said payment of ¼ of 1% to the Manufacturers Hanover Trust Company shall in no event exceed $304,416.67 and no interest or other increments shall be added to this sum. In the event that the Manufacturers Hanover Trust Company declines so to accept whatever may accrue to it under the foregoing computation, the Trust Company's claim for services against the New Haven estate shall be disallowed in toto.[3]

■ 3(a). *Simpson, Thacher & Bartlett,* counsel for Manufacturers Hanover Trust Company, July 7, 1971–August 30, 1971.

Simpson, Thacher & Bartlett's charges for attorneys' fees, July 7, 1971–August 30, 1971, are presented as expenses of the Manufacturers Hanover Trust Company as indenture trustee for the New Haven's First and Refunding Mortgage.

At the outset the court should call attention to the remarks made by the trustee for the debtor, in his statement of position, relative to the Simpson, Thacher firm's services in this matter, involving its client's breach of trust. They are as follows:

"If the Court considers Manufacturers' activities, in light of its conflict of interest, to warrant either disallowance or reduction of its fee, it is the Trustee's position that the Court should take into account that no question has ever been raised concerning the conduct of its counsel, Simpson, Thacher & Bartlett. Even though, as required under § 77(c)(12), the petitioner is Manufacturers, rather than its counsel, and even though counsel can theoretically look to the client for payment, as a practical matter, a reduction in the amount allowed as reimbursement for legal fees is likely to impact persons who, in the Trustee's view, have benefited the Estate and as to whom no misconduct has even been intimated." (Footnote omitted.)

■ Although the court disagrees with the conclusions reached by counsel for the Manufacturers Hanover Trust Company in its brief that there were sufficient reasons given by the Trust Company to excuse it from a charge of breach of its fiduciary duty as indenture trustee for the New Haven's First and Refunding Mortgage bonds, it does agree with the statement by the New Haven reorganization trustee relating to the Simpson, Thacher firm. Such deductions as are made from the firm's statement of its services to the New Haven estate are for reasons which are in no way connected with any breach of fiduciary trust by the Manufacturers Hanover Trust Company.

The evidentiary material presented on behalf of the firm by Horace McAfee, Esquire, a senior partner, in his affidavit gave an excellent general narrative account of its participation in the reorganization proceedings of the New Haven Railroad from their inception on July 7, 1961 to August 30, 1971. With this account there was attached a thorough, detailed appendix which particularized everything done by the Simpson, Thacher firm as counsel to the indenture trustee for the New Haven's First and Refunding Mortgage bonds.

**3.** This forfeiture provision is not intended to become operative simply through the taking of

an appeal from this judgment by the Manufacturers Hanover Trust Company.

In general, the law firm of Simpson, Thacher & Bartlett, as counsel for the indenture trustee, attended and participated in every court hearing (other than a few which were simply routine), which concerned the reorganization of the New Haven Railroad. They also represented the indenture trustee in the hearings before the three-judge court in the Southern District of New York and at the hearings held by the special master on the valuation of the Grand Central Terminal Properties.

From time to time they met and conferred with the reorganization trustees or trustee and their counsel on various problems in the reorganization, including financing (such as Trustees Certificates), tax problems, leasing of cars and equipment, opposing harmful proposed amendments to New York State tax laws, sales of pieces of property subject to the mortgage of which Manufacturers Hanover Trust Company was indenture trustee, involving partial releases from the mortgage and the application or use of the proceeds, work on a plan of reorganization of the Boston and Providence Railroad, representation of the indenture trustee in aid of the New Haven estate in reorganization concerning certain abandonment proceedings and an effort to discontinue the costly New Haven Railroad passenger service, including a hearing before an I.C.C. hearing examiner.

With the reorganization trustees of the New Haven, and cooperation of the United States Trust Company, as indenture trustee for the Harlem River Division Mortgage, Simpson, Thacher played a very active and important role including judicial proceedings before this court, the United States Court of Appeals for the Second Circuit and petitions for certiorari to the Supreme Court, in barring the high priority claims of "six months" creditors of the New Haven, including per diem claims for a total of approximately $6,000,000.

After the reorganization trustees of the New Haven had negotiated a tentative contract with the officers of the Pennsylvania and New York Central Railroads, which were seeking to merge, pursuant to which the New Haven reorganization trustees were to turn over the transportation plant of the New Haven Railroad to the merged railroads for approximately $125,000,000, subject to the approval of the New Haven reorganization court, the Pennsylvania and New York Central Railroad negotiators requested and were given to understand that the New Haven reorganization trustees would not seek an increase in the amount of the consideration to be paid by the merged Pennsylvania and New York Central Railroads. The New Haven reorganization trustees had thus established a beginning and a foundation for an inclusion price. The agreement never came before the reorganization court for approval and it was routinely sent along to the I.C.C. for initial study and action. All of the petitioners (or their predecessors, as the case may be) took the position that the consideration moving to the New Haven estate was wholly inadequate. As the New Haven reorganization trustees felt disqualified to seek changes in the tentative contract because of their understanding with the negotiators (a position which the court understood and expressly approved), the court left it entirely in the hands of the petitioners (or their predecessors), at the time, to oppose the contract and seek a larger payment or price for the property of the New Haven. This involved pressing for disapproval of the agreement by the I.C.C. which that body denied, hearings before the three-judge court in the Southern District of New York, a lengthy trial on review in the reorganization court, followed, after a grant of certiorari, by briefing and arguments before the Supreme Court. As counsel representing the indenture trustee for the New Haven's First and Refunding Mortgage bonds, Simpson, Thacher pulled the laboring oar in presenting the case before the Commission in the lower courts, and particularly in the Supreme Court. The senior partner of Simpson, Thacher & Bartlett prepared the brief and made the principal argument before the Supreme Court. He was ably seconded by the arguments of Attorney Migdal for the Bondholders Committee, and by Attorney Auerbach, special counsel to

the reorganization trustee. Attorney Bushby of Dewey, Ballantine, Bushby, Palmer & Wood, prepared and filed an excellent brief.

The decision of the Supreme Court fixed the price to be paid for the New Haven properties at $174,600,000. The difference between this amount and approximately $125,000,000, i. e. $49,600,000, is roughly what the petitioners claim is the portion of the judgment attributable to their efforts except, they say, that there should be credited to them errors in the I.C.C. computation which three of them discovered. (1) The Dewey, Ballantine firm, counsel for Chase Manhattan Bank, N.A., spotted a double counting by the I.C.C. of $16.2 million paid in taxes; (2) the Simpson, Thacher firm, as counsel for Manufacturers Hanover Trust Company, discovered that cost of liquidation had not been discounted to present value, resulting in an understatement of $3,800,000; and (3) the Carter, Ledyard firm found there was an error in the New Haven estate's appraiser's valuation of the Bronx freight yards, resulting in an underappraisal of $4,600,000. Disclosure of these errors in the I.C.C. valuation determination added $24,600,000 to its computation and to the difference between the first I.C.C. valuation and the ultimate price fixed by the Supreme Court.

Another achievement to which Simpson, Thacher & Bartlett contributed was the holding by the Supreme Court that the shares of stock of the Penn Central, to be used in partial payment to the New Haven Railroad, particularly in the light of Penn Central's filing for reorganization under § 77, was substantially overvalued for the purpose of "underwriting" the purchase price as ordered by this court and that part of the case was remanded "to determine the form that Penn Central's consideration to New Haven should properly take and the status of the New Haven estate as a shareholder or creditor of Penn Central." *New Haven Inclusion Cases, supra,* 399 U.S. 392, at 489, 90 S.Ct. 2054, at 2108, 26 L.Ed.2d 691.

The foregoing illustrative high points of the services rendered by the Simpson, Thacher firm, if studied in connection with the thorough review of the history of the New Haven reorganization proceedings, contained in the Supreme Court opinion in the *New Haven Inclusion Cases,* will reveal the complexity and, to a degree the novelty of the wide variety of issues with which the firm was required to deal.

The detailed account of the part it played and the contribution it made to the reorganization proceedings, are well set out in the affidavit of Horace J. McAfee, Esquire, and the attached appendix, as mentioned above. The court finds that the matters therein recited and the representations made are true and correct and that the fair and reasonable value of their services as counsel to Manufacturers Hanover Trust Company as indenture trustee for the New Haven's First and Refunding Mortgage bonds is $808,000, plus such contingent addition as may later eventuate in accordance with a provision hereinafter recited.

4. *CHASE MANHATTAN BANK,* N.A., as Trustee under the Debtor's General Income Mortgage. July 7, 1961– March 31, 1972.

The evidentiary material shows that Chase Manhattan Bank, N.A., incurred and expended $84,648.83 in expenses connected with its services on behalf of the Debtor's estate. The court had previously indicated at a chambers conference held on March 8, 1966 that it would not authorize payment out of the Debtor's estate at that time for further studies to be made by Messrs. Wyer and Dick, but that this petitioner together with the First and Refunding Mortgage Trustee could later apply for reimbursement for these expenses. Inasmuch as neither the nature nor amount of these expenses claimed by the Chase Manhattan Bank is contested, the court finds that all of the expenses were made, as alleged, and that they were reasonable and necessary, and they are approved and allowed under § 77(c)(12), and are ordered reimbursed as hereinafter set forth.

The Chase Manhattan Bank contributed to the benefit of the Debtor's estate as a whole by its efforts to procure the services

of Mr. Wyer for consultation work to be done by him with respect to a freight-only study which was being prepared by the New Haven Railroad staff and for a study regarding the savings which might eventuate in the event of inclusion of the New Haven's freight operations in Penn Central. It also contributed to the benefit of the debtor's estate by its cooperation and "watch-dog" services in connection with the day-to-day operation of the New Haven Railroad, for example the leasing arrangements by the reorganization trustees with the New York Port Authority, as set out generally in the affidavit of Mr. Schreiber and incorporated by reference in the affidavit of Charles F. Ruge, a Vice President of the Chase Manhattan Bank, N.A. The court finds that these representations are true and it is the opinion of the court that the fair share of the claim to be paid as hereinafter set forth by the Debtor's estate of the request for compensation made by the Chase Manhattan is $44,400.

4(a). *Dewey, Ballantine, Bushby, Palmer & Wood,* counsel for Chase Manhattan Bank, N.A., July 7, 1961–March 31, 1972.

With regard to the attorneys' claim for services, the court accepts as true the representations and statements made in the affidavit of Joseph Schreiber which details the work performed. Since the beginning of these reorganization proceedings, there were before the court and the I.C.C. no issues of significant importance relating to the New Haven Railroad's reorganization and its efforts to preserve and enhance its assets in which counsel for Chase Manhattan Bank was not heard or did not participate. The Debtor's estate was benefited in particular by the observation of Mr. Schreiber that the I.C.C. had included $16.2 million dollars of accrued real estate taxes erroneously in liquidation expenses. It took appeals to the three-judge court and to the reorganization court, twice, before this error was finally corrected by the I.C.C. The Debtor's estate was also particularly benefited by the separate and distinct efforts of counsel for the Chase Manhattan Bank in connection with the claim on the value of

that portion of New Haven's interest in the net income from the Grant Central hotel and office buildings; the inclusion of the New Haven in the Penn Central merger and the evaluation studies of the New Haven's assets carried out by Mr. Wyer; and the appeal to the Supreme Court relative to the *Inclusion Cases.*

After taking into consideration any alleged duplication of services by counsel for the respective petitioners and the benefit to the Debtor's estate, as a whole, it is the opinion of the court that the fair share to be paid as hereinafter set forth by the Debtor's estate of the claim by Dewey, Ballantine, Bushby, Palmer & Wood for compensation is $706,337, plus such contingent amount as may, at a future time, be payable as hereinafter provided.

■ 5. *LAWRENCE W. IANNOTTI, Successor Trustee* under the Debtor's First and Refunding Mortgage.

Lawrence W. Iannotti, successor indenture trustee under the New Haven's First and Refunding Mortgage, has petitioned for compensation for his services as trustee and his out-of-pocket expenses and for the services and expenses of his counsel, Tyler, Cooper, Grant, Bowerman & Keefe, for the period from July 1, 1971 to June 28, 1974.

The court finds that the statements and representations recited in the petitioner's verified petition are true and correct with the exception of an error in mathematical computation of the fees of the petitioner's attorneys which requires a disallowance of $2,330.00. The statement of out-of-pocket expenses amounts to a total of $4,481.38. The expenses are found to have been reasonable and necessary and are ordered to be paid as hereinafter indicated.

The successor trustee fully and conscientiously performed all of the necessary watchdog services in protection of the bond issue and the New Haven estate. In addition he vigorously and skillfully participated in the litigation protecting the Debtor's estate and developed proposals for advancing payments on account of the purchase price for the New Haven properties.

After considering the successor trustee's performance of the watchdog services and his contributions in addition to them, and considering the great amount of time and energy he was required to expend to gain an historic knowledge of the New Haven reorganization prior to the date of his appointment on July 1, 1971, and a grasp of the problems current at that time, the court is satisfied that the compensation for his services, including those of his counsel, to the New Haven estate should be fixed at $68,100, as just and reasonable compensation, which is ordered to be paid in accordance with the schedule hereinafter set forth.

■ 6. *JACOB D. ZELDES, Successor Indenture Trustee* under the Debtor's General Income Mortgage.

Jacob D. Zeldes, successor indenture trustee for the General Income Mortgage Bonds, has petitioned for compensation for his services as successor indenture trustee and his out-of-pocket expenses as well as the expenses for the services of his counsel Zeldes, Needle and Cooper, P.C. These cover the period February 11, 1972 to June 15, 1975.

The court finds that the statements and representations recited in the petitioner's verified petition are true and correct and that his bill for out-of-pocket expenses in the amount of $1,165.91 is for items that were necessary and the charges are reasonable in amount. It is therefore ordered that they be paid from the Debtor's estate, as hereinafter indicated. The court further finds that the petitioner's services benefited the Debtor's estate and that the legal services rendered by his firm made a valuable contribution to the estate. The indenture trustee fully performed the required watchdog services and in addition he exercised great skill in appearing at contested hearings before I.C.C. and the reorganization court on many occasions. His account of services rendered begins five days before his appointment as indenture trustee became official, because he had been offered and agreed to accept the appointment and immediately commenced the onerous task

of gaining an understanding of the New Haven reorganization proceedings and the problems existing at the time. It is the opinion of the court that just and reasonable compensation to the successor indenture trustee for his services to June 15, 1975 is $33,971, to be paid as hereinafter provided by the Debtor's estate.

*Contingent fee claims*

■ Three of the law firms whose services have been discussed above, have claimed that they participated in these proceedings on a contingent fee basis, which, presupposes that the action or proceeding has been carried through to the end, a result has been achieved in the form of a recovery of money, out of which a percentage, previously agreed upon, is taken out and is paid to the attorney as his fee. In the present case there is no substantial cash recovery. The claims for having benefited the estate almost entirely concern matters leading up to and participating in the prosecution of the *New Haven Inclusion Cases* and the achieving of a judgment. When counsel say they achieved a great result, they are not contradicted, but it did not include a recovery of the purchase price for the New Haven properties. For the purpose of computing a contingent fee, it is only a money recovery that counts in the end. By this standard nobody knows at present how good the result really was. The present holding that the petitioners are entitled to recover certain fees, eliminates the risk of loss that they had carried but the fees are less than what a true contingent fee agreement would provide. What evidence there was of fee agreements implied that they were not entirely contingent. In case nothing had been recovered, it is fairly clear that the petitioners would have at least shared the loss. Nevertheless there was a kind of quasi contingent fee arrangement in which one chance factor was whether or not something would be granted by the court as allowances out of the Debtor's estate; and the other contingency was whether or not there might be a cash recovery under the Supreme Court

judgment. Under the circumstances, however, allowances in the range of customary contingent fees could not be granted. The New Haven estate cannot justly be required to pay out, over the next few years, any more than the total expenses and non-contingent fees already awarded herein.

If, however, payments were to be made to the New Haven reorganization trustee for the property taken by the Penn Central, it is the court's opinion that the principal contingency would have occurred—a result stemming in substantial part from the contributions made by the petitioners to the New Haven reorganization proceedings.

It is, therefore, further ordered that in the event that there is a future recovery by the reorganization trustee of the New Haven Railroad of payments by the Penn Central or its successors or assigns, on account of the purchase price fixed by the Supreme Court for the New Haven properties in the *New Haven Inclusion Cases,* the reorganization trustee or his successor or successors shall pay to:

(1) MANUFACTURERS HANOVER TRUST COMPANY for and on account of the services of its attorneys Simpson, Thacher and Bartlett,

¼ of 1% of such payment or payments;

(2) FIRST MORTGAGE 4% BONDHOLDERS COMMITTEE for and on account of the services of its attorneys Migdal, Tenney, Glass & Pollack,

¼ of 1% of such payment or payments; and

(3) CHASE MANHATTAN BANK, N.A., for an on account of the services of its attorneys Dewey, Ballantine, Bushby, Palmer & Wood,

⅛ of 1% of such payment or payments.

*Schedule of Payments:*

The payments (other than contingent fee payments) ordered to be made from the Debtor's estate by the New Haven reorganization trustee to the petitioners for services contributed to the New Haven estate pursuant to the terms of this decision will be made to the following petitioners, in the amounts specified at the time indicated:

UNITED STATES TRUST COMPANY OF NEW YORK will be paid $5,625.00 on or before September 30, 1976 and $5,625.00 on each and every March 30th and September 30th thereafter to and including March 30, 1980, when said principal sum shall have been paid in full.

UNITED STATES TRUST COMPANY OF NEW YORK, on behalf of its counsel, Carter, Ledyard & Milburn, will be paid $56,250.00 on or before September 30, 1976 and $56,250.00 on each and every March 30th and September 30th thereafter to and including March 30, 1980, when said principal sum shall have been paid in full.

FIRST MORTGAGE 4% BONDHOLDERS COMMITTEE will be paid on behalf of its counsel Breed, Abbott & Morgan, $5,275.00 on or before September 30, 1976 and $5,275.00 on each and every March 30th and September 30th thereafter to and including March 30, 1980, when said principal sum shall have been paid in full.

FIRST MORTGAGE 4% BONDHOLDERS COMMITTEE will be paid on behalf of its counsel Migdal, Tenney, Glass & Pollack, $79,001.88 on or before September 30, 1976 and $79,001.88 on each and every March 30th and September 30th thereafter to and including March 30, 1980, when said principal sum shall have been paid in full.

FIRST MORTGAGE 4% BONDHOLDERS COMMITTEE will be paid on behalf of its counsel Harry P. Lander, $250.00 on or before September 30, 1976 and $250.00 on each and every March 30th and September 30th thereafter to and including March 30, 1980, when said principal sum shall have been paid in full.

MANUFACTURERS HANOVER TRUST COMPANY will be paid on behalf of its counsel Simpson, Thacher & Bartlett, on or before September 30, 1976, $101,000.00 and $101,000.00 on each and every March 30th and September 30th thereafter to and including March 30, 1980, when said principal sum shall have been paid in full.

CHASE MANHATTAN BANK, N.A., will be paid $5,550.00 on or before Septem-

ber 30, 1976 and $5,550.00 on each and every March 30th and September 30th thereafter to and including March 30, 1980, when said principal sum shall have been paid in full.

CHASE MANHATTAN BANK, N.A., will be paid on behalf of its counsel Dewey, Ballantine, Bushby, Palmer & Wood, $88,-292.13 on or before September 30, 1976 and $88,292.13 on each and every March 30th and September 30th thereafter to and including March 30, 1980, when said principal sum shall have been paid in full.

LAWRENCE W. IANNOTTI, Successor Trustee, will be paid $8,512.50 on or before September 30, 1976 and $8,512.50 on each and every March 30th and September.30th thereafter to and including March 30, 1980, when said principal sum shall have been paid in full.

JACOB D. ZELDES, Successor Indenture Trustee, will be paid $4,246.38 on or before September 30, 1976 and $4,246.38 on each and every March 30th and September 30th thereafter to and including March 30, 1980, when said principal sum shall have been paid in full.

Reimbursement of expenses to the petitioners to whom they have been heretofore awarded shall be payable: one-half (½) on or before January 6, 1977 and the remaining one-half (½) on or before July 6, 1977.

All payments for services and for reimbursement of expenses as herein awarded, whether contingent or not, shall be payable *without interest* and shall be *final* as of the last date of the services rendered as alleged in their respective petitions and not interim, except in the cases of petitioners Iannotti and Zeldes as to each of whom the payments are interim.[4]

The court retains jurisdiction over the orders specifying the dates and amounts of payments and all elements of the orders for contingent fee payments, all of which are subject to amendment or modification as justice and equity shall require.

## ORDER SUPPLEMENTING AND CLARIFYING THIS COURT'S OPINION OF JUNE 30, 1976

The Manufacturers Hanover Trust Company having filed a petition for clarification of this court's opinion, and certain respondents having filed answers and objections thereto, and all parties in interest having been duly notified of said petition and of the time and place assigned for hearing thereon, and having been heard or having been given an opportunity to be heard, this court now supplements and clarifies its opinion as follows:

The allegedly unclear portion of the court's June 30, 1976 opinion concerns the interpretation and application of two sentences on page 266 which are: "Too much, of course, should not be read into or inferred from such phrases as 'breach of fiduciary trust' or 'disqualified . . . as indenture trustee'. Such descriptive words do not say or imply that the Trust Company indulged in any conduct of a criminal nature or sought in any way to take or use other persons property for its own use, or otherwise acquire any personal gain for itself." It still seems obvious that the intent and purpose of these sentences were to forfend against the drawing of extreme and unjustified inferences by any of the parties in interest and by the general public against this petitioner by equating the phrase "breach of fiduciary trust" with criminal conduct such as embezzlement and larceny or with civil conversion or misappropriation of the trust res or a part of it. The above quoted two sentences were included in the opinion for the purpose above stated and no other. They are wholly irrelevant to any claim of failure on the part of the petitioner fully to carry out its equitable duties and obligations, or any consequences thereof, as Indenture Trustee for the New Haven bonds. The issues before

4. The New Haven Reorganization Trustee is empowered, in its discretion, to anticipate any of the payments ordered to be made under the within schedule of payments, that is, he may pay any one or more of them in advance of the date on which it is ordered to be paid under the schedule.

the court at the time the decision of June 30, 1976 was rendered, concerned only the compensation of the petitioners and the reimbursement of their expenditures.

The petitioner plainly breached its fiduciary duty to the New Haven Railroad in reorganization and for five years has continued to do so. It has expressly stated its intention to adhere to this position in the future and to oppose and contest the claim of the New Haven estate in reorganization that the purchase price due for the New Haven's property, based upon the Supreme Court's judgment against the Penn Central in the *Inclusion Cases,* is secured by an equitable lien. For the past three years, at least, the petitioner has made no genuine effort to resign as Indenture Trustee for the remaining 17 bond issues for which it is still Indenture Trustee. In the light of all of these circumstances this court was unable to make an outright, unconditional award of compensation for services rendered the New Haven estate by the petitioner and therefore made it contingent for obvious reasons.

This court in the proceedings on the petitions for compensation and the judgment of June 30, 1976, did not adjudicate any past or future claim for damages based upon a breach of fiduciary trust on the part of the Manufacturers Hanover Trust Company as indenture trustee for the First and Refunding Mortgage Bonds of the New Haven Railroad; and the finding of such a breach was made solely for the purpose of disclosing the reason underscoring the contingent nature of and the amount and time of payment of compensation, if any, which might become payable to the Trust Company. It was not intended to constitute a bar to any defense the Trust Company might interpose in an action for damages against it in any possible future litigation concerning its responsibilities as indenture trustee to the estate of the New Haven Railroad in reorganization.

The court retains and continues to retain jurisdiction over the issues in this case and affirms its judgment of June 30, 1976, discussed herein. It is so ordered.